577 So.2d 755 (1991)
Joann TURNER, Individually, etc.
v.
POINTE COUPEE PARISH SCHOOL BOARD, et al.
No. 89 CA 2092.
Court of Appeal of Louisiana, First Circuit.
March 28, 1991.
Writ Denied May 24, 1991.
C. Jerome D'Aquila, New Raods, for plaintiff-appellant.
Robert L. Kleinpeter, Kleinpeter & Kleinpeter, Baton Rouge, for defendant-appellee.
Before LOTTINGER, SHORTESS and CARTER, JJ.
SHORTESS, Judge.
On October 12, 1983, ten-year-old Catina Williams was entering a classroom when an unidentified child threw the classroom door shut ahead of her.[1] Catina raised her hand to stop the door and, as a result, her *756 hand broke through one of the door's glass panels. Catina's injuries consisted of lacerations of the ulnar nerve and two tendons, the palmaris and flexor carpi ulnaris tendons. Because of the injuries Catina now suffers from a deformity referred to as a "claw hand."
Joann Turner, individually and as the natural tutrix of her minor daughter, Catina Williams (plaintiff) sued Pointee Coupee Parish School Board (defendant) to recover for injuries Catina sustained which were caused by the accident. Plaintiff argued at trial that defendant was negligent and strictly liable for not having installed some form of safety glass in the door's panels. After a trial on the merits the trial court ruled in favor of defendant and dismissed plaintiff's suit. Subsequently, plaintiff perfected this appeal essentially reurging the same position she presented to the trial court.
The school was constructed in 1941 and originally provided classrooms for the first grade through high school. Shortly before the accident, the school was converted into an elementary school. The doors to the classrooms have wood panel bottoms and four narrow horizontal glass panels which start approximately 35 to 38 inches from the floor and about 2 or 3 inches above the doorknob. The record does not reveal the thickness, composition, or dimensions of the glass panels. However, from the photographs provided in the record, each panel appears to be about 18 inches long and 6 inches high.
The trial court, in ruling for defendant, apparently relied exclusively on LSA-R.S. 40:1711-1715 which imposes criminal sanctions for failure to use "safety glazing materials" in any hazardous location. Specifically, the trial court relied on LSA-R.S. 40:1711(2) that provides in pertinent part: "... wood panel doors with small lights thirty-six inches or more above the floor... are not to be considered hazardous and these installations are not to be included within the definition of hazardous locations as set forth hereinabove." Assuming for the sake of argument that the article is applicable to the present case[2] where the building was constructed well before the enactment of the statute in 1972, we conclude the trial court erred in finding that per se compliance with the statute relieves defendant of liability. This court in Williams v. Exxon Corp., 541 So.2d 910, 918 (La.App. 1st Cir.), writ denied, 542 So.2d 1379 (La.1989), held that compliance with existing building codes does not in and of itself relieve defendant of liability. See also Morrison v. Clearview Medical Plaza, 357 So.2d 1386 (La.App. 4th Cir.), writ denied, 359 So.2d 622 (La.1978). Although the cases cited examined whether compliance with the building codes provided a safe harbor for defendants, we find the rationale of the cases apply with even more force where the issue is whether compliance with an act imposing criminal liability for using certain glazing materials relieves one of potential civil liability. Compliance (or noncompliance) with the act is simply another factor to be considered in the totality of the circumstances.
The testimony reveals the school had not experienced a prior problem with the doors. Only once in 17 years has the need arisen to replace any of the glass panels in the doors of the school. Defendant replaced a glass panel after it was deliberately broken to gain access to an office. Understandably, defendant argues that under the circumstances there was nothing to indicate it knew or should have known that an unreasonably dangerous condition existed. But, as stated by the Louisiana Supreme Court, under the law in effect at the time of the incident,[3] "[w]here delictual responsibility is based not on negligence *757 but on legal fault, under article 2317, a public body's knowledge of the existence of the danger is irrelevant[;] [l]iability is a consequence of the fact of ownership and custody in itself, not of the breach of a duty." Jones v. City of Baton Rouge, etc., 388 So.2d 737, 740 (La.1980).
This court in Williams v. Exxon Corp., 541 So.2d at 913, articulated the elements plaintiff must prove in order to recover. Plaintiff must prove (a) that the thing which caused the damage was in the care (custody) of the defendant owner, (b) the existence of a defect or vice of the thing and (c) that his damage occurred through this defect or vice. In Entrevia v. Hood, 427 So.2d 1146 (La.1983), the supreme court stated that there is a limit on the owner's strict liability. The owner may only be held responsible for things which pose an unreasonable risk of harm to others. The court went on to say that the application of strict liability must only be determined after a full study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations.
The only issue of consequence presented by the parties is whether the door was defective and unreasonably dangerous.
As noted by the supreme court in Dixon v. Allstate Ins. Co., 362 So.2d 1368, 1370 (La.1978), thousands of injuries occur each year as a result of collisions with glass doors and panels. According to the unrebutted testimony of plaintiff's expert, studies have shown that the majority of persons injured as a result of glass breakage are children under the age of 15, even though this group forms a small percentage of the population. He gave several reasons for this unfortunate phenomena: children are preoccupied with doing other things; they do not appreciate the hazards of pushing on glass the way older people might; there is also a difference in stature and size in relationship to the doorknob where they would typically push. Also, the expert testified that failure of the defendant to use some form of safety glass created a hazardous situation.
Applying the above precepts, we note that the owner of the door is a public body with taxing authority. The cost imposed by the application of strict liability can be spread widely among the persons who benefit from the state school system. The potential for harm is great because the door is subject to heavy use by children. This particular door is used as an entrance to the classroom that has a high traffic pattern. Moreover, the glass panel which caused the injury is located two to three inches above the doorknob, just where small children will often with their hands push to open or try to stop a door about to slam in their face. The cost of replacing the pane directly above the doorknob is slight in light of the cost of injuries, actual or potential.
Defendant argues that the cost of replacing the panels would strain an already excessively burdened budget. However, the only glass that concerns us are the panels directly above the doorknob. These are the panels most likely to cause injuries to small children attending the school.
For the above reasons, we reverse the trial court's judgment. Since we have the entire record before us, we will decide the issue of quantum instead of remanding the case.
Plaintiff was admitted to the Earl K. Long Hospital the day of the injury, October 12, 1983. The next day she underwent surgery to repair the lacerations of the ulnar nerve as well as the repair of two tendons, the palmaris longus and the flexor carpi ulnaris. The surgery went well, and she was discharged that same afternoon.
Plaintiff returned several times to the hospital for follow-up visits. In general, the outpatient medical records reveal that she developed a claw hand, a static deformity in which some of the joints of the hand go into hyperextension while other joints go into flexion.
Plaintiff saw Dr. Ronnie Matthews, an orthopedic surgeon, on January 22, 1988. His examination of the intrinsic muscles of *758 her hand revealed weakness and atrophy. Matthews also found that plaintiff does not have normal nerve sensation in her hand. Based on guidelines set by the American Medical Association and the Academy of Orthopedic Surgeons, Matthews estimated she will suffer from a 26% disability to the left upper extremity.
According to Matthews, additional surgery could be of some value to plaintiff but that future surgery will not completely return the hand to normal.
As a result of the accident, plaintiff can no longer perform many of life's simple tasks, such as buttoning her clothes, tying her shoes, and putting a bow in her hair.
After thoroughly reviewing the record, we conclude that a general damage award of $150,000.00 is reasonable under the circumstances presented. C.f. Streeter v. Sears Roebuck and Co., Inc., 533 So.2d 54 (La.App. 3d Cir.1988), writ denied, 536 So.2d 1255 (La.1989) (general damage award of $145,333.33 to plaintiff suffering from a claw hand as a result of ulnar nerve damage).
The judgment of the trial court is accordingly reversed at defendant's costs.
REVERSED AND RENDERED.
NOTES
[1] The trial court made no specific finding of fault on the part of the unidentified child.
[2] In Wilkinson v. Hartford Accident & Indemnity Co., 411 So.2d 22, 23 (La.1982), the supreme court indicated the statute did not apply to impose liability on a school board for a building constructed in 1965. But, compare Dixon v. Allstate Ins. Co., 362 So.2d 1368, 1370 (La.1978) where the court in an earlier case apparently considered the statute under circumstances similar to Wilkinson.
[3] Compare LSA-R.S. 9:2800 enacted in 1985 which only allows the imposition of strict liability when the public body has actual or constructive knowledge of the particular vice or defect.