587 So.2d 722 (1991)
Carolyn Denise Turpin DURKEE, Appellee,
v.
The CITY OF SHREVEPORT, Appellant.
No. 22469-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1991.
Writ Denied December 2, 1991.
*724 Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley, and James A. Mijalis, Shreveport, for appellant.
James L. Fortson, Shreveport, for appellee.
Before MARVIN, SEXTON, NORRIS, VICTORY and BROWN, JJ.
NORRIS, Judge.
The City of Shreveport appeals a judgment which held the city strictly liable for a defect on its premises and awarded damages of $269,068.68 to the plaintiff, Carolyn Durkee. We conclude the trial court did not err in finding that the city's premises were defective, that the defect caused the plaintiff's injuries or that the plaintiff was *725 not comparatively negligent; however, the court abused its discretion by awarding excessive damages. The judgment will be amended and affirmed.

Facts
Mrs. Durkee worked for Shreveport Air Center, an independent contractor at the Shreveport Regional Airport. Her job, which she had held for over four years, was to ride a golf cart or van from the terminal to the planes that just landed, transport passengers or luggage from the plane to the terminal, carry supplies to the plane, and get passengers or luggage to the plane before it took off. On the average day she made 25 to 30 trips from the tarmac to the ramp area.
On the morning of December 31, 1986 she had driven some passengers in the van from a private plane to their connecting flight. She returned to the rear entrance of the old terminal building and parked the van. She parked it over a narrow strip of concrete on which a free-standing fence had once stood. When Mrs. Durkee stepped from the floorboard to the ground, her right foot landed squarely on an iron fence post stub that protruded about 4½" from the surface of the concrete. Her foot twisted with a loud "pop," rolled off the side of the I-beam and she fell to the ground. Her sudden pain was so severe that she could not even call for help. Fellow workers in the old terminal building spotted her in distress and had her conveyed by ambulance to the Willis-Knighton emergency room.
At the hospital Mrs. Durkee's foot was swelling out of her soft leather tennis shoe and badly discolored. Technicians packed the foot in ice, gave her some pain medication, placed the foot in a metal brace and then x-rayed the foot. According to hospital records, she was diagnosed with a severe sprain of the right ankle; she was advised to stay off the foot and see a private physician.
On January 2, 1987 Mrs. Durkee went to Dr. Don Burt, an orthopedist in Shreveport. Finding her foot still swollen, he took more x-rays and diagnosed a severe ankle sprain which should heal in eight to 10 weeks; he told her to use crutches, stay off work a while and attend therapy.
Mrs. Durkee did so, returning to light duty work after two weeks. She received electrical stimulation therapy at the Bone and Joint Clinic and saw Dr. Burt three times in January 1987. Although she was working only light duty and abridging her usual routine of heavy athletic and sporting activity, her foot was not getting much better. She returned to Dr. Burt in June 1987 saying she improved for a while but was still having recurrences of soreness and swelling. She also complained of an unsightly blue lump on the right side of her foot. Dr. Burt did not at the time note any swelling or blue lump; he took additional x-rays which were negative. He again diagnosed a severe ankle sprain. He testified in deposition that Mrs. Durkee was experiencing a "flare-up" of the old sprain.
Sometime in early 1987 Mrs. Durkee's husband took a new job and moved his family to Atlanta, Georgia. She has not worked outside the home since the move. On the morning of July 24, 1987 Mrs. Durkee went to make a 180° turn in her kitchen and her right foot "gave way" beneath her; she collapsed in pain. She went to the Family Practice Center, where a general practitioner advised her she had aggravated the prior ankle sprain and sustained another sprain or strain. He prescribed pain medication, wrapped the ankle and advised her to stay off her injured foot. Mrs. Durkee complied and enjoyed an initial improvement; however, she continued to experience episodes of pain, sometimes so bad she could not walk.
On September 23, 1987 she saw a podiatrist in Georgia, Dr. Alan Shaw. Dr. Shaw noted that her complaint of pain was directly over the calcaneo-cuboid joint. He took an anterior-posterior x-ray which, he testified, showed a fracture of the joint with a bone chip. He described it as an avulsion fracture, consistent with her history of a "fairly violent" twist of the ankle in December 1986. Dr. Shaw recommended conservative treatment but advised her that *726 surgery might be the only way to get lasting relief.
Mrs. Durkee filed this suit in October 1987. On the advice of her counsel, she went to another Shreveport orthopedist, Dr. Ragan Green, in November 1987. Dr. Green noticed diffuse thickening in the lateral midfoot and tenderness over the lateral calcaneo-cuboid joint. He ran an x-ray which showed calcification, perhaps indicative of a ligamentous injury, but no evidence of a break. He diagnosed a sprain of the foot (not ankle). At a second visit in March 1989, Dr. Green x-rayed the entire foot and found a small bone spur at the calcaneo-cuboid joint.
Mrs. Durkee returned to Dr. Shaw in March 1989; he took more x-rays and ran a CT scan which he interpreted as showing degenerative changes, an old fracture and a bone chip. Because over two years of conservative treatment had failed to end her of episodes of acute pain, Mrs. Durkee underwent surgery in May 1989. The surgery went as expected except that Dr. Shaw removed two bone chips (measuring 1.5 × 1.3 × 0.3 cm and 1.4 × 0.9 × 0.5 cm) and a fragment of firm fibrofatty tissue (measuring 1.0 × 0.7 × 0.4 cm) from the site. By the time of trial in October 1989, Mrs. Durkee testified that the old blue lump was gone and she could do more walking now.
Dr. Shaw testified that even with the surgery, he would expect Mrs. Durkee to experience two or three painful flare-ups a year for the rest of her life. He estimated that each flare would last four to six weeks, requiring four or five doctor visits and x-rays, for a total of $500, and 12 or 13 therapy sessions, which his office does not perform and are not included in his medical estimate. He assessed a permanent disability of 12% for the lower extremity and 4-5% for the whole body.
Mrs. Durkee's expert economist, Dr. Melvin Harju, testified that her life expectancy was 46.4 years. On the basis of three flare-ups per year, each requiring medicals of $500 and 12 or 13 therapy sessions (which Mrs. Durkee estimated at $60 or $70 apiece), she would sustain future medical costs with a present value of $115,326. He also testified that doctor visits and therapy sessions would cause her to lose 36 half-days of work per year over her worklife expectancy of 16.6 years, thus diminishing her future earnings by $14,307 to $23,001.

Action of the trial court
In a long written opinion, the trial court found that the city owned and operated the area where the accident took place; that the walkway had a protruding yet inconspicuous fence post which created an unreasonable risk of harm and was therefore defective; that the city had reasonable notice of the defect; that the defect caused Mrs. Durkee's injury; and that Mrs. Durkee was not comparatively at fault. The court further found that the injury was a fracture of the foot, not merely a sprain. The court assessed damages as follows:

 General damages $135,000.00
 Past medicals 3,742.68
 Future medicals and therapy 115,326.00
 Future lost wages 15,000.00
 ___________
 TOTAL: $269,068.68

The city appealed suspensively.

Discussion: Fault
By its first assignment the city urges the trial court was clearly wrong in finding that the condition of the premises created an unreasonable risk of harm and in failing to assess comparative fault against the plaintiff. The city argues, in essence, that the exposed fencepost was not a hazard or pitfall, and that the sole cause of the accident was Mrs. Durkee's own inadvertence.
A municipality is obligated to maintain its sidewalks in a reasonably safe condition. La.C.C. art. 2317; McDade v. Town of Oak Grove, 545 So.2d 1276 (La. App. 2d Cir.1989); May v. Lafayette Parish Police Jury, 487 So.2d 503 (La.App. 3d Cir.), writ denied 489 So.2d 1276 (1986). A defect is some flaw or fault existing or inherent in the thing itself, creating an unreasonable risk of harm to others. Entrevia v. Hood, 427 So.2d 1146 (La.1983). To determine what constitutes an unreasonable risk of harm courts balance several factors including the probability and gravity *727 of the harm presented by the risk against the social utility of the defendant's conduct or the thing involved. Entrevia v. Hood, supra.
While a municipality is liable for damages resulting from defects on its property, it is not liable for every irregularity that causes injury. McDade v. Town of Oak Grove, supra; Scroggins v. Sewerage & Water Bd., 533 So.2d 132 (La.App. 4th Cir.1988). The plaintiff bears the burden of proving both the defect that makes the premises unreasonably dangerous and the resultant damages. Sellers v. Caddo Parish Comm'n, 503 So.2d 1073 (La.App. 2d Cir.), writ denied 506 So.2d 1229 (1987); Naylor v. Louisiana Dept. of Hwys., 423 So.2d 674 (La.App. 1st Cir.1982), writ denied 429 So.2d 127, 134 (1983). Moreover, a public entity's liability for defective premises is limited by La.R.S. 9:2800 B, which provides in part:
[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity had a reasonable opportunity to remedy the defect and has failed to do so.
The plaintiff bears the burden of proving, in addition to defect and causation, actual or constructive notice on the public entity's part. Fragala v. City of Rayville, 557 So.2d 1118 (La.App. 2d Cir.), writ denied 561 So.2d 103 (1990). Once the plaintiff meets this burden, the burden shifts to the defendant to prove a defense. Loescher v. Parr, 324 So.2d 441 (La.1975). The defendant may prove the plaintiff was comparatively at fault. La.C.C. art. 2323; Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). The trial court's findings as to fault and allocation of fault are not disturbed in the absence of manifest error. Rosell v. Esco, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La. App. 2d Cir.1984).
The protruding post on which Mrs. Durkee was injured was located on a strip of concrete used as a sidewalk. It is one of several posts that once supported a free-standing fence; when the fence was removed, all the other posts were cut to ground level for safety purposes, according to the city's superintendent of maintenance, Mr. Albritton. This post, however, stood about 4 to 4½" high, according to Mrs. Durkee; Mr. Albritton placed it at about 1½" high. Mr. Albritton admitted that the uncut stub was "unsafe." R.I, p. 209. The post obviously served no useful purpose and was dangerous to pedestrians walking in the area.
Mrs. Kay, an employee at the Air Center, testified that the stub had a rusty, dirt-colored look and blended in with the terrain; Mrs. Durkee testified it was "fairly obscured" by the brown December grass. Mrs. Kay added that she had stumbled over it but did not report the incident. Neither Mrs. Durkee nor Mr. Albritton had ever noticed the stub, and the photos in evidence show that the sidewalk is otherwise level. Mrs. Durkee testified that when she alit from the van she could not see it. Given the danger posed, the lack of utility and the inconspicuousness of the post, the trial court was not plainly wrong to find the post was a hidden defect which posed an unreasonable risk of harm.
Mr. Albritton testified that city maintenance workers removed the fence in mid-1984 or 1985 and cut the posts to ground level for safety reasons. He had no explanation why this post was left standing. He admitted that his routine safety inspections had not found or corrected it. This evidence supports the trial court's finding that the city had actual or constructive notice of the defect and reasonable opportunity to correct it but failed to do so. R.S. 9:2800 B.
The city urges with some force that Mrs. Durkee was at fault for failing to see the post. The finding that the post was a hidden defect implies that it was not *728 visible by the use of reasonable care; a pedestrian need exercise only reasonable care in using the sidewalk. Carter v. Board of Sup. of LSU, 459 So.2d 1263 (La.App. 1st Cir.), writ denied 462 So.2d 1248 (1984); Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir.1988). Admittedly Mrs. Durkee had parked her van and walked in this area often; however, this record does not contain satisfactory proof that she could or should have seen the post. She had never noticed it or tripped on it; her job required her to pay attention to the planes and passengers rather than to study the ground for hidden defects. On this record we cannot conclude that the trial court was clearly wrong in assigning no fault to the plaintiff.
This assignment does not present reversible error.

Causation
By its second assignment the city urges the trial court was clearly wrong in finding that Mrs. Durkee suffered a fractured foot, as opposed to a sprain, as a result of the accident of December 31, 1986. It argues that of all the doctors who examined her and the radiologists who x-rayed her, only Dr. Shaw found a fracture; thus the trial court was plainly wrong to accept his findings over everyone else's. The city further argues, conceding that Dr. Shaw actually found large bone chips when he operated, that these chips were too large to have arisen from the accident at the airport.
A plaintiff's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, provided that the medical evidence establishes a reasonable possibility of causal connection between the accident and the disabling condition. Housley v. Cerise, 579 So.2d 973 (La.1991); Lucas v. Insurance Co. of N. Amer., 342 So.2d 591 (La.1977); Simpson v. Caddo Parish Sch. Bd., 540 So.2d 997 (La.App. 2d Cir.1989). The trial court's finding that an accident caused the plaintiff's injuries is a matter of fact and will not be reversed on appeal absent manifest error. Mart v. Hill, 505 So.2d 1120 (La.1987); Rosell v. Esco, supra.
The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. Middle Tennessee Council Inc. v. Ford, 274 So.2d 173 (La.1973); Tyler v. Richardson, 476 So.2d 899 (La.App. 2d Cir.), writ denied sub nom. Wilson v. Richardson, 478 So.2d 907 (1985). The trial court may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject medical or lay opinion. Whitacre v. Halo Optical Products Inc., 501 So.2d 994, 76 A.L.R. 4th 185 (La.App. 2d Cir.1987). The testimony of a treating physician is generally accorded more weight than that of a physician who examines the plaintiff much later and for diagnosis only. Hartman v. Dittco Div., Nat'l Steel Prod., 510 So.2d 423 (La.App. 2d Cir.), writ denied 513 So.2d 291 (1987); Butler v. American Ins. Co., 138 So.2d 862 (La.App. 4th Cir.1962).
The city correctly points out that Dr. Burt examined and x-rayed Mrs. Durkee's foot two days after the accident; the x-ray appeared normal and he diagnosed a sprained ankle. By the time he released her to work on January 19, 1987 he felt the ankle was improving. According to his deposition, a sprain should resolve itself in eight to 10 weeks; however, Mrs. Durkee returned to him five months later, still complaining of recurrent soreness and swelling. Dr. Burt's explanation was that this was a "flare-up," which was not usual but often beset athletes. In July 1987, after Mrs. Durkee's foot "gave way" in her kitchen, she went to a clinic in Georgia; the radiologist who x-rayed her then found no fracture. Dr. Green, who first examined Mrs. Durkee in November 1987, almost a year after the accident, also diagnosed a soft tissue injury or severe foot sprain. He noted, however, some calcification. Before he operated, Dr. Shaw ordered a CT scan of Mrs. Durkee's right ankle. The radiologist, Dr. Dille, found "no evidence of deformity" *729 other than minimal spurring and degenerative changes.
Dr. Shaw testified that the initial x-rays from Willis-Knighton were taken while Mrs. Durkee was wearing a metal splint which blocked the injured area. He said that some "bony irregularity" was nevertheless apparent, adding that it was "not uncommon" for emergency room technicians to miss an injury like this. Reviewing Dr. Burt's x-rays, Dr. Shaw explained that they focused on the ankle rather than the calcaneo-cuboid joint, and were never taken from the medial oblique angle, which would better show the fracture. Dr. Shaw stressed that if this had been only a sprain, Mrs. Durkee would not still have been suffering pain in June 1987, when she returned to Dr. Burt, or in September 1987, when she came to him. Dr. Shaw testified that this injury had to be a fracture, and it was verified by his CT scan analysis and the surgical findings.
Given this evidence, the trial court was not clearly wrong to find that the accident at the airport caused the fracture of Mrs. Durkee's right foot. She was in excellent health before, and the pain and swelling started only with this accident. Although Drs. Burt and Green felt that she suffered only a sprain, Dr. Shaw offered a credible explanation of why their findings might have been mistaken. We also note that Dr. Shaw was not hired for diagnosis only; though he first saw Mrs. Durkee nine months post accident, he treated her more extensively than anyone else. The jurisprudence of Hartman v. Dittco Div. and Butler v. American Ins. Co., supra, does not apply to discount Dr. Shaw's findings. On the contrary, he was well qualified (the city stipulated to his expertise), and his series of examinations and surgery provided ample basis for the trial court to accept his findings. Tyler v. Richardson, supra.
The city finally argues that the bone fragments recovered in surgery were simply too large to have escaped everyone else's notice and are strongly suggestive of a subsequent injury. Dr. Burt stated in deposition that a bone chip 1.5 cm. long is "almost unbelievable" because "the joint is not hardly that long." Dr. Shaw, however, testified that the pathologist's measurement seemed larger than the fragment and must have included soft tissues, such as bits of ligament, that were attached to the bone. The trial court implicitly accepted Dr. Shaw's explanation and we find no plain error. Mart v. Hill, supra. Moreover, the city's hypothesis that something else must have caused the injury has simply no support on this record. See Housley v. Cerise, supra, and citations therein.
This assignment does not present reversible error.

Quantum
By its third assignment the city urges the trial court was clearly wrong in awarding excessive damages. First it argues the general damages are too high for someone who sustained only a sprain, not a fracture; in the alternative, $135,000 was too much for even a fractured foot. Second it argues the plaintiff did not adequately prove the need for, or cost of, future medical treatment, for which the trial court awarded $115,326. Finally it contests the award of $15,000 for lost future earnings.
When damages are insusceptible of precise measurement, much discretion is left to the trial court to assess reasonable damages. La.C.C. art. 1999. Before the court of appeal can disturb an award of general damages, the record must clearly reveal that the trial court abused its discretion. Coco v. Winston Indus. Inc., 341 So.2d 332 (La.1976). Only after such a determination is made may the court of appeal amend the award, and then only to the extent of lowering (or raising) it to the highest (or lowest) amount reasonably within the trial court's discretion. Coco v. Winston Indus. Inc., supra; Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691 (La.1981). After finding an abuse of discretion the court of appeal may consider whether prior awards for truly similar injuries are out of proportion to the instant award. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La.1978); Bordelon v. Aetna Cas. & Sur. Co., 494 So.2d 1283 (La.App. 2d Cir.1986).
*730 The burden of proof in a claim for future medical expenses and loss of future earnings or earning capacity is a preponderance of evidence. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). When the plaintiff has proved his legal right to recover damages the court may award them, even though they cannot be exactly estimated. Jordan v. Travelers Ins. Co., supra; Thompson v. Simmons, 499 So.2d 517 (La.App. 2d Cir. 1986), writ denied 501 So.2d 772 (1987). Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that they are indicated, and setting out their probable cost. Hunt v. Board of Sup., LSU, 522 So.2d 1144 (La.App. 2d Cir.1988); Poche v. Frazier, 232 So.2d 851 (La.App. 4th Cir.), writ denied 256 La. 266, 236 So.2d 36 (1970).
At the outset we reiterate that the trial court was not plainly wrong in finding that the accident of December 31, 1986 resulted in a fractured foot. The city's argument that damages should be gauged to a severe sprain lacks merit.
We have therefore reviewed the record to see whether it supports an award of $135,000 for pain, suffering and disability arising from a fractured foot. The trial court stated that Mrs. Durkee suffered "extensive pain" for 2½ years after the "original injury." She suffered severe pain when she twisted her foot on the protruding post. However, after three weeks of following doctor's orders, she appeared well enough to return to work light duty. In June 1987 Dr. Burt found that she had done well for a while before the soreness recurred. Dr. Burt stated in deposition that pain from this kind of injury could recur, as in walking up steps or stairs. Burt's depo., 8. Dr. Shaw also testified that her "recurrent" problems are consistent with this injury. R. II, p. 251. While the surgery has improved her condition, Dr. Shaw felt that painful future recurrences could be expected for the rest of her life.
The trial court also noted that the injury had limited her activity level, which had previously included many outdoor activities with her husband such as fishing, hiking, mountain climbing and waterskiing. The record supports this. The trial court finally stated that Mrs. Durkee has been required to wear tennis shoes to "social events." The testimony on this score is not very specific, but we feel that Mrs. Durkee was justly concerned about matters of dress and appearance. On the whole, considering all the record evidence, we are constrained to conclude that $135,000 general damages for a foot fracture, equating to a 5% whole body disability in a physically active woman, is above the trial court's discretionary range.
We have examined the cases that both sides have cited for comparison. In Jenkins v. Jenkins, 439 So.2d 504 (La.App. 1st Cir.1983), and Gravois v. Succession of Trauth, 498 So.2d 140 (La.App. 5th Cir. 1986), writ denied 500 So.2d 422 (1987), cited by the city, the plaintiffs received general damage awards of $16,000 and $35,000 respectively. Although these injuries are somewhat similar to Mrs. Durkee's, both courts stressed that the awards were almost abusively low. In Lee v. State Farm Fire & Cas. Co., 400 So.2d 330 (La. App. 4th Cir.1981), also cited by the city, the plaintiff received $40,000; there is not much discussion of the plaintiff's pain and suffering, and the opinion is 10 years old. The plaintiff cites the cases of Istre v. ABC Ins. Co., 517 So.2d 1225 (La.App. 4th Cir. 1987), Guillotte v. DOTD, 503 So.2d 618 (La.App. 4th Cir.1987), and Parker v. South La. Contractors Inc., 370 So.2d 1310 (La.App. 1st Cir.), writ denied 374 So.2d 662 (1979). In those cases the plaintiffs received total awards of $123,372.65, $130,421.27 and $84,000.00 respectively. The discussions in these opinions show the injuries therein were more severe and disabling that Mrs. Durkee's, and each award includes special damages.
Recognizing the extent and severity of Mrs. Durkee's injury and permanent disability, we find that $100,000 is the highest general damage award reasonably within the range of discretion afforded the trial *731 court. The judgment will be amended accordingly.
As for future medicals, the city first urges that Mrs. Durkee did not prove these are necessary. In support it cites passages of Dr. Shaw's testimony which, in isolation, seem tentative:
I do suspect that on an average of two or three times a year, depending on her activity level, that she will have flare-ups or episodes in the foot of pain that would require what I would think of as conservative non-surgical treatment.
I would suggest that the treatment time during each of those episodes that I would need to see her would range from four to six weeks; and during that four to six-week period, we would see the patient probably four or five times.
When we prescribe physical therapy, not just for Mrs. Durkee but on a general sensewe generally prescribe itwe feel that it doesn't work unless it's done two to three times a week for at least three to four weeks. * * * I would guess over the four to six-week period, she would probably have twelve or thirteen physical therapy sessions. R. I, pp. 126-128 (emphasis added).
Dr. Shaw, however, effectively agreed that Mrs. Durkee would probably have continuing problems with the foot for the rest of her lifetime. R. II, p. 282. The city's trial attorney drew this conclusion when cross examining Dr. Shaw:
Q. All right. Dr. Shaw, you previously stated that in all probability or in your expert opinion Mrs. Durkee could anticipate at least two flare-ups a year; is that correct, of the foot condition?
A. When we did the deposition * * * I believe that we referred to approximately two flare-ups a year. * * * But I would say two to three visitsthree on an average. As she gets older, I expect her to need more care than she will in the short term. So I would think in the overall span of her lifetime that a reasonable average would be three visits a year. R. I, pp. 135-136 (emphasis added).
It is not necessary for a plaintiff's medical witness to recite the proper legal jargon verbatim before a trial court may credit that testimony; a trial court is in a superior position to interpret the substance of the testimony. Housley v. Cerise, supra. Moreover, Dr. Burt admitted that recurrences were possible and Dr. Green stated that it was a "chronic type of problem." Burt's depo., 8; Green's depo., 5. Given the totality of the evidence, the trial court was not plainly wrong in finding sufficient medical testimony that flare-ups were likely and future medical treatment was more probable than not.
We agree, however, with the city's argument that the part of the future medical award attributable to the cost of physical therapy is not supported by expert medical testimony. Dr. Shaw declined to comment on the cost or exact nature of future physical therapy because his office does not perform physical therapy. R. II, p. 284. Mrs. Durkee testified that the cost of physical therapy varies, depending on what kind of therapy was performed. She stated, "I would say $60 to $70 is the cost of one visit." R. II, p. 342.
An award for future medical expenses is by nature speculative and not susceptible of mathematical certainty. Like any other element of special damages, however, future medical cost can and must be established with some degree of certainty. Awards will not be made for future medicals which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable cost. Hunt v. Board of Sup. of LSU, supra; Holman v. Reliance Ins. Co., 414 So.2d 1298, 35 A.L.R. 4th 81 (La.App. 2d Cir.), writ denied 420 So.2d 164 (1982). Dr. Shaw refused to project the cost of future therapy sessions and there is no other medical evidence, testimonial or documentary, to establish it with reasonable certainty. Mrs. Durkee's estimated ("would say") and uncorroborated cost is insufficient proof. Hargroder v. Protective Life Ins. Co., 556 So.2d 991 (La.App. 3d Cir.), writ denied 559 So.2d 1367 (1990). Under these facts the portion of the award attributable *732 to cost of future physical therapy cannot stand. The judgment will be amended accordingly.
As for future lost earnings, the evidence is sufficient to support the trial court's finding that three times each year Mrs. Durkee will need medical treatment that will require her to miss about one half day's work, if she works. The trial court assumed a very conservative earning capacity on Mrs. Durkee's part. The award of $15,000 for loss of earning capacity was not an abuse of discretion.

Conclusion
The judgment is affirmed insofar as it found the city liable for the condition of its walkway that caused Mrs. Durkee's injury, absolved Mrs. Durkee of comparative fault and found that she suffered a fractured foot. The judgment is accordingly amended in the following particular awards:

 General damages $100,000.00
 Past medicals 3,742.68
 Future medicals 48,532.00
 Future lost wages 15,000.00
 ___________
 TOTAL $167,274.68

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, CAROLYN DENISE DURKEE, and against the defendant, THE CITY OF SHREVEPORT, in the full sum of one hundred sixty-seven thousand, two hundred seventy-four and 68/100 dollars ($167,274.68), together with legal interest thereon from date of judicial demand until paid, together with all court costs imposed in accordance with La.R.S. 13:5112.
Costs of appeal in the amount of $155.50 are assessed one-half each to the City of Shreveport and to Mrs. Durkee.
AMENDED AND AFFIRMED.
VICTORY, J., concurs in part, dissents in part with written reasons.
SEXTON, J., dissents with written reasons.
VICTORY, Judge, concurring in part, dissenting in part.
I concur with the majority's opinion that the city is liable and the plaintiff was not at fault. However, I would reduce the general damages award to $75,000, the future medicals to $20,000, and the future lost wages to $7,500.
SEXTON, Judge, dissenting.
In spite of the reduction, I still consider the award about 50 percent too high. I would also assess plaintiff with some minor degree of fault.