635 So.2d 485 (1994)
Joseph Brad HARIG, Plaintiff-Second Appellant,
v.
The STATE of Louisiana, BOARD OF ELEMENTARY & SECONDARY EDUCATION, Defendant-First Appellant.
No. 25702-CA.
Court of Appeal of Louisiana, Second Circuit.
March 30, 1994.
*487 Sutton & Sutton by Bobby D. Sutton, Jr., Shreveport, for plaintiff-second appellant.
Richard Ieyoub, Atty. Gen., Davis & Singleton by Dorothy F. Jackson, Shreveport, for defendant-first appellant.
Before NORRIS, LINDSAY and STEWART, JJ.
NORRIS, Judge.
In this slip and fall case, the State of Louisiana appeals a trial court judgment that found the State's premises defective, absolved the plaintiff of comparative fault, awarded damages totaling $245,939.85, and assessed certain costs. The plaintiff, Joseph Brad Harig, also appeals, urging the damages are inadequate. For the reasons expressed, *488 we affirm the substantive portion of the judgment, but amend the decree to assess exact court costs in accord with R.S. 13:5112.

Factual background
At the time of the accident in October 1990, Brad Harig was a 41-year old student at the Regional Technical Center. The record shows that he has a mild learning disability; although he did not require special education, his mother described him as "a little bit slow." He had originally enrolled in upholstery but was moved to culinary arts, where the faculty felt he could perform better.
The premises involved is the culinary arts department at the Regional Technical Center ("Vo-Tech"), a secondary school owned and operated by the State of Louisiana, Board of Elementary and Secondary Education. The school is divided into four areas, meats, pastry, salad and storeroom. A large refrigeration unit in the storeroom produces condensation that must be drained out of the building. Because of venting concerns, the drain cannot be located directly under the unit. Instead, the drain was located in a walkway between the storeroom and the salad area. An insulated pipe from the unit stuck through a wall and ran parallel to the floor, about 4" above the floor, until it reached the drain. The drain itself was some 4" from the wall, and surrounded by a raised brass cup. The walkway in which the drain was located was 44 to 46" wide. There was no reflective tape or any other special safety device on the pipe. There were, however, stenciled signs on the walls that read, "Think Safety." Chef McClain, the cooking instructor, testified that he constantly admonished students, collectively, to be careful and safe in their activities. He never gave any special warnings about the condensation pipe. He admitted, however, that the hallway in which it was located was a major thoroughfare for students. Mr. Merritt, the director of the school, testified that in his 5½ years as director, no one had ever tripped over that condensation pipe.
On the morning of October 19, Brad was in class, leaving the refrigeration unit. At trial, he described the accident as follows: "I fell over the drain trying to go get a box for Carmen, a friend of mine" and "I just fell oversee, my foot hit and I fell over the drain." In an accident report completed a few days after the fall, Mr. Merritt said he learned that Brad was backing out of the walk-in refrigeration unit when he tripped. The only other eyewitness to testify was Brad's friend, Carmen Faulk. She stated in deposition that Brad was walking backwards when he tripped over the pipe. She could not verify that he was carrying anything when the accident happened, but stated that when he fell, it was a very busy time of the day. As she described it, things were moving "pretty fast" and Brad was "a little intimidated" as he tried to move quickly out of the other students' way.
Brad fell to the floor, striking his head, shoulder and knee. The shoulder injury was the most serious. At Schumpert Medical Center, Dr. Baer Rambach, an orthopedic surgeon, diagnosed a fractured dislocation of the right shoulder, the "ball" having been shattered into a number of pieces. He performed surgery to remove the bone fragments and to insert a prosthetic "ball." During his hospitalization, Brad suffered seizures, which Dr. Rambach attributed to his medication. Dr. Alan Borne, an internist who had treated Brad previously, followed his seizures until January 1992, when he discharged Brad with a good prognosis. The shoulder prognosis, however, was not good. Dr. Rambach assigned a 60-70% permanent partial disability and function loss of the shoulder, and a 20% permanent partial impairment of the whole body. He also testified that in the course of his lifetime, Brad would need two new prostheses, each less effective than the previous one. At trial Brad demonstrated that he could no longer lift his right arm any higher than his shoulder, and he must use his left hand for all daily functions. He is right-handed. Brad testified that he has not been able to find work since the accident, although he has applied for numerous food-service jobs.
Brad also testified that before this accident he was somewhat hard of hearing. After he was hospitalized for the shoulder surgery, *489 however, his hearing became worse. He attributed this to the seizures he suffered as a result of medication he received in the hospital for surgical pain.

Action of the trial court
In an excellent written opinion, the district court concluded first that the exposed condensation pipe posed an unreasonable risk of harm on school's premises, and that this defect caused Harig's damages. The court next considered the conduct of both Harig and the defendant, compared them, and concluded that Harig was not guilty of comparative negligence in causing the accident. Turning to damages, the court reviewed the medical evidence and found that general damages of $140,000 would be appropriate. Past medical expenses of $42,203.51 were proved. The court then calculated future medical expenses of $33,736.34, based on the medical evidence of necessary future shoulder prostheses. Finally, the court awarded $30,000 for lost earning capacity and economic opportunity, based on Harig's diminished ability to compete in the job market. Finally, the court enumerated various expert witness and transcription costs, and assessed "all costs in this matter" against the State.
As noted, the State has appealed, advancing four assignments of error. Harig has answered the appeal, advancing three assignments.

Discussion: Defect
By its first assignment the State urges the trial court erred in finding that the exposed condensation pipe was a defect of the premises; and, alternatively, even if it was a defect, the plaintiff did not prove that the State had actual or constructive notice of the condition.
Like other property owners, schools are obligated to keep their premises in a reasonably safe condition. La.C.C. art. 2317; Turner v. Pointe Coupee Parish Sch. Bd., 577 So.2d 755 (La.App. 1st Cir.), writ denied 580 So.2d 673 (1991). A defect is some flaw or fault existing or inherent in the thing itself, creating an unreasonable risk of harm to others. Entrevia v. Hood, 427 So.2d 1146 (La.1983). To determine what constitutes an unreasonable risk of harm, courts balance several factors including the probability and gravity of the harm presented by the risk against the social utility of the defendant's conduct or the thing involved. Entrevia v. Hood, supra.
While a public entity is liable for damages resulting from defects on its property, it is not liable for every irregularity that causes injury. Durkee v. City of Shreveport, 587 So.2d 722 (La.App.2d Cir.), writs denied 590 So.2d 68 (1991). The plaintiff bears the burden of proving both the defect that makes the premises unreasonably dangerous and the resultant damages. Sellers v. Caddo Parish Comm'n, 503 So.2d 1073 (La. App.2d Cir.), writ denied 506 So.2d 1229 (1987). Moreover, a public entity's liability for defective premises is limited by La.R.S. 9:2800 B, which provides in part:
[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
The State is a public entity for purposes of this statute. La.R.S. 9:2800 E.
The plaintiff bears the burden of proving, in addition to defect and causation, actual or constructive notice on the public entity's part. Durkee v. City of Shreveport, supra. Once the plaintiff meets this burden, the burden shifts to the defendant to prove a defense. Loescher v. Parr, 324 So.2d 441 (La.1975). The trial court's findings are accorded great weight and will not be disturbed absent a showing of manifest error. Stobart v. State DOTD, 617 So.2d 880 (La. 1993); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990).
As to the existence of a defect, the State argues in brief that "plaintiff offered no evidence to show that the pipe was, in fact, a defect which presented an unreasonable risk of harm to a prudent person using ordinary *490 care." The record, however, completely undermines this position. Mr. Robert Logue, a Vo-Tech instructor of air conditioning and refrigeration (and who was accepted by the trial court as an expert in those fields) testified that he had viewed the condensation drain on numerous occasions. In a pretrial deposition, he testified that this drain was dangerous because it stuck out from the wall into a passageway. At trial he attempted to retreat from this position, but nevertheless admitted that the pipe was positioned such that someone's foot could get caught under it. R.p. 140. He testified that he would not have laid the pipe the way it was; he suggested running it down to the floor, across the floor, and directly into a flat drain. He called his suggestion a "good method," but declined to call it the "proper method." R.p. 143. In answers to interrogatories, which were admitted into evidence at trial, the State declared that after the accident it had found "improper installation" of the pipe. R.pp. 24, 238.
The State also urges in brief that the social utility of the drain outweighed the risk it posed. Drainage is essential to prevent a buildup of moisture in the kitchen area, and placing a drain directly under the refrigeration unit would pose the risk that sewer fumes might escape into the kitchen. We certainly do not dispute the necessity of proper drainage, and the social utility of the Vo-Tech. However, Mr. Logue clearly established that these needs could be served by utilizing different designs or constructions that did not place a 4" high pipe in a busy walkway. On these facts, the trial court was entitled to find that the condensation pipe and drain posed an unreasonable risk of harm. Stobart v. DOTD, supra.
As to notice of the defective condition, the State urges on appeal that the plaintiff failed to show that the State had actual knowledge of it, and that the facts presented were not sufficient to place the State on constructive notice. In support it cites the evidence that no accident like Harig's had ever occurred in either Mr. Merritt's or Mr. Logue's memory. The record also shows, however, that the State accepted the construction of the building in June 1977, some 13 years before this accident. The fact that the condition existed a long time before the accident is a factor in the finding of constructive notice. Fortune v. City of New Orleans, 623 So.2d 701 (La.App. 4th Cir.1993). Moreover, Mr. Merritt testified that he had walked past and observed the condensation pipe on hundreds of occasions in recent years. On these facts, the trial court was not plainly wrong to find that the State had constructive notice of the defect in the Vo-Tech. Stobart v. State DOTD, supra.
The State's first assignment of error lacks merit.

Comparative fault
By its second assignment the State urges the trial court committed manifest error in failing to find Harig at fault for his injuries. It argues that the accident happened as Harig was backing out of the refrigeration unit without watching his step or seeing that his path was clear, and that these facts mandate a finding of comparative fault.
If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss. La. C.C. art. 2323; Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). In assessing the nature of the conduct of the parties, various factors are considered:
(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) How great a risk was created by the conduct;
(3) The significance of what was sought by the conduct;
(4) The capacities of the actor, whether superior or inferior, and
(5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
469 So.2d at 974.
*491 The manifest error rule applies in cases of comparative negligence. Sistler v. Liberty Mutual Ins. Co., supra; Towns v. Georgia Casualty & Sur. Co., 459 So.2d 124 (La.App.2d Cir.1984).
The determinative evidence, in the trial court's view, was the deposition testimony of Carmen Faulk, the only other eyewitness to the accident besides Harig himself. From Ms. Faulk we learn "at that time of day that he was very busy, and things were moving pretty fast" and a person needed to move "quickly." Dep., 15. This is corroborated by Chef McClain's testimony that the hallway was a major thoroughfare for students. R.p. 101. Mr. Merritt testified that he liked to have 22 students in each class. R.p. 206. Ms. Faulk added that Harig was somewhat intimidated by the rush of people. What with the other testimony that he was a slow learner, the trial court would not be wrong to consider that he tried to get out of the quicker students' way. The other relevant evidence was that despite the utility of the condensation pipe and drain, Mr. Logue testified that it could have been installed more safely, and it had existed in an unsafe condition for over 13 years. Harig, however, had never noticed the drain before. R.p. 150.
The evidence shows that extenuating circumstancesthe crowd and rush of the hallwaywere definitely present to make Harig proceed without careful thought. It appears that the State anticipated full classes and busy activity. The record also shows that the State was fully aware of the condition for over 13 years, whereas Harig had been a student in the culinary arts department for only a few months and had not ever seen it. While the State's objective of properly draining and venting the refrigeration unit was definitely significant, the State also had the higher capacity to fulfill this objective safely. Finally, even though the State proved that it displayed several "Think Safety" signs and instructed the students to be careful in their activities, a reasonable factfinder could conclude that these admonishments were directed primarily at the performance of culinary assignments, and not to hazards underfoot. In the balance, the evidence shows a higher level of responsibility and fault on the part of the State than on Harig.
As noted, the trial court as factfinder is vested with great discretion in assessing the relative fault of the parties. Watson v. State Farm, supra; Towns v. Georgia Casualty & Sur., supra. On the facts presented, we cannot say the trial court was plainly wrong to assess all fault to the State. The State's second assignment lacks merit.

Quantum
By its third assignment, the State urges that the damages were excessive. Most importantly, it argues that general damages of $140,000 are too high for Harig, and submits that $75,000 was the highest affirmable amount. It also challenges the award of future medicals as based on "pure speculation and possibilities," and contends there was no evidence that Harig would be unable to work or engage in gainful employment in the future.
By his first assignment, Harig urges that the damages were inadequate; he submits that the lowest affirmable award would be $350,000. He also argues the trial court was plainly wrong not to include as an element of past medical expenses $1,080.00 for hearing aids that were allegedly necessitated by postoperative seizures.
When damages are insusceptible of precise measurement, much discretion is left to the trial court to assess reasonable damages. La.C.C. art. 1999. Before the court of appeal can disturb an award of general damages, the record must clearly reveal that the trial court abused its discretion. American Motorist Ins. Co. v. American Rent-All, 579 So.2d 429 (La.1991); Coco v. Winston Indus. Inc., 341 So.2d 332 (La. 1976). Only after such a determination is made may the court of appeal amend the award, and then only to the extent of lowering (or raising) it to the highest (or lowest) amount reasonably within the trial court's discretion. Coco v. Winston Indus., supra; Durkee v. City of Shreveport, supra. After finding an abuse of discretion the court of appeal may consider whether prior awards for truly similar injuries are out of proportion *492 to the instant award. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La.1978); Durkee v. City of Shreveport, supra.
The plaintiff bears the burden of proving a causal relationship between the accident and the injuries complained of. American Motorist Ins. Co. v. American Rent-All, supra; Nejame v. Hamiter, 614 So.2d 848 (La.App.2d Cir.1993). A claimant's disability is presumed to have resulted from an accident, if before the accident he was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. Housley v. Cerise, 579 So.2d 973 (La.1991). The finding of causation is subject to the manifest error rule. Mart v. Hill, 505 So.2d 1120 (La.1987).
The burden of proof in a claim for future medical expenses and loss of future earnings or earning capacity is a preponderance of evidence. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). When the plaintiff has proved his legal right to recover damages the court may award them, even though they cannot be exactly estimated. Jordan v. Travelers Ins. Co., supra; Thompson v. Simmons, 499 So.2d 517 (La.App.2d Cir.1986), writ denied 501 So.2d 772 (1987). Even in the absence of proof of exactly how much the injured person has lost in his trade or occupation after the injury, an award for lost earning capacity may be premised on the fact that the injured person can no longer pursue his work as vigorously and energetically as before. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that they are indicated, and setting out their probable cost. Durkee v. City of Shreveport, supra; Hunt v. Board of Sup., LSU, 522 So.2d 1144 (La.App.2d Cir.1988).
The record easily shows that Harig's accident and treatment have been fraught with pain and difficulties. He testified that the fall brought on immediate pain. Roughly three weeks after the fall he had to undergo surgery to replace his right shoulder joint, followed by months of physical therapy and medical treatment. He also testified that pain medication he received at the hospital caused a recurrence of seizures, and seizure medication left him anemic and weak for months. Dr. Rambach testified concretely that the shoulder prosthesis would not last the rest of Harig's life, but would need to be replaced twice, each operation entailing another hospital stay followed by six months to a year of painful therapy and recovery. He also established that each successive replacement would be less effective, and more painful, than the one before. At the time of trial, Harig had a 60-70% permanent partial physical impairment and loss of physical function in his right arm and shoulder; he is right-handed. Dr. Rambach also assigned a whole body impairment of 25-30%. Harig testified that he suffers constant, intermittent pain as a result of his injuries. His condition has not only impaired his ability to play the guitar and do yard work, but affects his everyday activities such as buttoning his shirt and brushing his teeth.
The evidence obviously persuaded the trial court that Harig's injuries were substantial, and this is not plainly wrong. In the balance we must conclude that the general damage award of $140,000 is neither abusively high nor abusively low. Having determined that the award is within the trial court's discretionary range, we need not refer to other similar cases. However, in response to the State's argument in brief, we would point out that the $18,000 award for the plaintiff's shoulder fracture in Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.), writ denied 506 So.2d 1227 (1987), appears to be out of step with the majority of other reported cases and does not persuade us that the instant award is excessive. The awards outlined in Harig's brief, such as the $115,000 in Grigsby v. Schwegmann Bros. Giant Super Markets Inc., 417 So.2d 388 (La.App. 4th Cir.), writ denied 422 So.2d 156 (1982), are more representative, but do not support the award of $350,000 suggested in brief. While on the instant record we could perhaps have affirmed an award somewhat *493 higher than $140,000, we cannot say that the instant award is an abuse of the trial court's great discretion. It will be affirmed.
The State next contests, without any elaboration, the award of future medicals. Dr. Rambach testified that Harig would probably need two future prosthetic replacements, and possibly more. Dep., 13. This opinion was not contradicted, and it easily satisfies the requirement of medical testimony that the future medicals are indicated. Durkee v. City of Shreveport, 587 So.2d at 730. Dr. Rambach also testified that each hospital stay would cost roughly $20,000, and each surgical fee would be $5,000 to $7,000. Ms. Jeani Freeman, a rehabilitation specialist, estimated the cost of a replacement at $12,000 to $15,000. On this evidence the trial court was not plainly wrong to assess a "probable cost" of the future surgeries; we will not disturb it.
Next, Harig contests the trial court's failure to award $1,080 in past medical expenses for hearing aids. Harig argues that his hearing, which was admittedly diminished prior to the accident, became worse as a result of seizures that followed the administration of dilaudid, a pain medication, in the hospital after his shoulder surgery. In support he correctly shows both his and his mother's testimony that his hearing "dramatically decreased" after the operation. He also cites a report from a Dr. Wong of the LSU Medical Center, which allegedly proves causation between the medication and the hearing loss. The trial court found this proof insufficient.
The testimony of Harig and his mother obviously meets the first step of the test of Housley v. Cerise, supra, that disability occurred or increased after the accident. However, the medical evidence of causation is sketchy. Dr. Wong's report states that Harig had an audiogram in 1989 that showed a mild hearing loss and "he claims that he had a decrease in his hearing after an operation on his right shoulder in October 1990 in which he was given `Dilaudid' post-op that caused a seizure and subsequent bilateral decrease in his hearing. This is documented by audios sent from Dr. D. Pou" (emphasis added). By writing "he claims," Dr. Wong apparently did not adopt the patient's impression that the medicine caused the hearing loss, but merely reported it. Also, the report of Dr. Pou is not in the record; likewise the record lacks his testimony, although he was scheduled for deposition in September 1992. R.p. 40. The trial court was not plainly wrong to view this as an absence of medical evidence linking the accident and the disability. Housley v. Cerise, 579 So.2d at 980. The record also does not show that Harig's impaired hearing would not have diminished anyway, without the dilaudid. On this record, we find no manifest error in the trial court's refusal to award medical expenses for the hearing aids.
Finally, the State urges the trial court was plainly wrong to award $30,000 for loss of earning capacity and economic opportunity. While conceding the trial court's broad discretion in such an award, the State submits there was no evidence of Harig's physical condition before the injury, of his past work history and consistency, the wages he would have earned but for the injury, or the probability that he would have continued to earn wages for the rest of his working life.
The record shows, however, that prior to the accident Harig had worked at AT & T for 15½ years making keys for pay telephones. R.p. 126. He enrolled at the Vo-Tech after being laid off, and was not earning a wage at the time of the accident. Since graduation he has applied for various food service jobs, without success; both he and his mother attributed this to his inability to lift and fully use his arm. On this evidence the trial court could find that Harig is unable to pursue his chosen vocation as vigorously as before the accident, and that this has impaired his employment opportunities. Hobgood v. Aucoin, 574 So.2d at 348. Further, Ms. Freeman, the rehabilitation specialist, testified that he would miss six months to one year of work after each shoulder replacement surgery. Dep., 28. On these facts, we cannot say the trial court abused its broad discretion in awarding Harig $30,000 for lost earning capacity and economic opportunity.
The awards of general and special damages are affirmed.

*494 Expert witness fees and costs

By its fourth assignment the State urges the trial court erred in taxing as costs of court the expert witness fees of witnesses who did not appear in court to testify, but testified by way of deposition. In support it cites La.R.S. 13:3666 A, which provides that witnesses "called to testify in court only to an opinion founded on special study or experience" shall receive additional compensation to be fixed by court. The State further argues that the depositions do not reveal whether the experts had already been compensated, and that a rule to show cause is essential to fix the proper compensation.
Contrary to the State's argument, courts have held that experts who testify by deposition are entitled to expert witness fees, just as are experts who testify at trial. McAllister v. Champion Ins. Co., 602 So.2d 314 (La.App. 1st Cir.1992); Laughlin v. Breaux, 515 So.2d 480 (La.App. 1st Cir.1987), and citations therein. Here, each expert provided an invoice which Harig introduced, along with the transcribers' bills. The State did not traverse this evidence, and the record supports the assessment of these costs.
By his second assignment of error, Harig urges the trial court erred in failing to express the costs in a dollar amount. At the time of the instant trial, La.R.S. 13:5112 A provided in pertinent part:
In Any suit against the state * * *, the trial or appellate court * * * may award in favor of the successful party and against the state * * * such costs under R.S. 13:4533 and other applicable law as the court deems proper but, if awarded, shall express such costs in a dollar amount in the judgment of the trial court or decree of the appellate court.
(emphasis added)
The instant judgment, however, casts the State simply for "all costs of these proceedings." R.p. 67. Certified documents from the clerk of the district court show that costs totaled $699.60. The judgment will be amended to specify this amount in accord with R.S. 13:5112.

Decree
For the reasons expressed, the judgment is affirmed on all substantive matters: finding and assessment of fault, and general and special damages. The judgment is amended only to assess court costs of $699.60 to the State of Louisiana, Board of Elementary and Secondary Education.
Costs of appeal in the amount of $88.50 are assessed to the State of Louisiana, Board of Elementary and Secondary Education.
JUDGMENT AFFIRMED. DECREE AMENDED.