573 So.2d 1148 (1990)
Virginia HUTCHINSON
v.
WAL-MART, INC.
No. CA 89 1672.
Court of Appeal of Louisiana, First Circuit.
December 5, 1990.
*1149 Thomas B. Waterman, Ponchatoula, for plaintiff-appellee.
Frederick Campbell, Lisa Miley Geary, New Orleans, for defendant-appellant.
Before EDWARDS, WATKINS and LeBLANC, JJ.
LeBLANC, Judge.
The primary issues presented in this slip and fall case relate to the apportionment of fault between plaintiff, Virginia Hutchinson, and defendant, Wal-Mart, Inc., and quantum. After trial of this matter, the jury returned a verdict finding Wal-Mart 65 percent at fault and plaintiff 35 percent at fault and assessing plaintiff's damages at $285,000.00. The trial court granted plaintiff's motion for a judgment notwithstanding the verdict (JNOV) and reduced plaintiff's percentage of comparative fault from 35 percent to 10 percent, with a corresponding increase in Wal-Mart's percentage of fault, and raised the amount awarded for numerous items of damages, increasing the total amount awarded from $285,000.00 to $790,000.00. Defendant Wal-Mart now appeals this judgment.

FACTS
On September 2, 1986, plaintiff was shopping in a Wal-Mart store located in Hammond, Louisiana. After selecting several items and placing them in a shopping basket she was pushing for that purpose, she decided to browse further and began walking down an aisle in the vicinity of the sporting goods department. The aisle in question was fourteen feet wide; located at regular intervals along the aisle were at least five stack bases, which are wooden platforms 4×4 foot in size and 6 3/8 inches high used for the purpose of stacking and displaying merchandise. In the center of each stack base there was a 22 inches square sign used to display the price of the items featured thereon. There was approximately five feet of passage room on each side of the stack bases.
Plaintiff walked down the left side of this aisle passing several of these stack bases. As she passed one certain stack base, her interest was caught by some fishing rods located on a cross-aisle. She described what then occurred as follows:
When I got to where the rod and reels were, it caught my eyes. And it was on my left, but my buggy was up past where the rod and reels were and I took a step or two back to turn my buggy to go down the aisle and that is when I fell over the pallet [stack base].
The section of the stack base plaintiff fell onto was empty of merchandise at the time. Ben Thomason, a Wal-Mart employee, testified that shortly before plaintiff's fall he had been restocking this particular stack base when he was called away by a customer needing assistance. He testified he had been gone for only approximately two minutes when plaintiff fell. In any event, he admitted that the section of the stack base upon which plaintiff fell was empty, but stated that the other half of the stack base was completely stocked with merchandise. This testimony was corroborated by the testimony of the store manager, Don Sanford, who arrived at the scene almost immediately after plaintiff fell. Plaintiff herself stated that she did not remember there being any merchandise whatsoever on the stack base, but that she was "not saying there wasn't. I am saying where I fell there wasn't."
Plaintiff was helped to her feet and assisted to the employee's lounge, where she rested for twenty to twenty-five minutes. She was then helped into a car and taken to the office of Dr. Dwayne Burch, a chiropractor, where she complained of pain in her neck, shoulder and back, tingling in her arms, headache and dizziness. Plaintiff was treated by Dr. Burch on a total of twenty-five occasions from the time of the accident through October 21, 1986, but both he and plaintiff stated that she obtained little improvement in her complaints. *1150 She then went to her family physician who ordered several tests to be performed. However, since plaintiff did not have the money to pay for these tests and Wal-Mart refused to pay for them, she did not have them done.
On January 13, 1987, plaintiff consulted Dr. Dropadi Kewalramani, a specialist in physical medicine and rehabilitation, continuing to complain of basically the same symptoms she experienced on the date of the fall. Dr. Kewalramani prescribed anti-inflammatories, muscle relaxants and pain medication, as well as moist heat to the neck and back. Plaintiff was ordered to use a heating pad at home for thirty minutes daily. Plaintiff again saw Dr. Kewalramani on February 3, February 17 and March 5, 1987.
On her February 17th visit, plaintiff related to Dr. Kewalramani that she had experienced a severe pain in her middle back upon picking up a blackboard weighing six to seven pounds. At trial, Dr. Kewalramani stated emphatically that, while this incident may have aggravated plaintiff's condition, it was her opinion that it did not cause plaintiff's lower back disc problems.
On March 16, 1987, plaintiff began treatment with Dr. R.C. Llewellyn, a neurosurgeon. A CAT scan ordered by Dr. Llewellyn revealed a spur deformity and some protrusion of the disc at C5-6 and a bulging disc at L5-S1. Plaintiff was hospitalized from June 8 through June 15, 1987 for additional testing, traction and physical therapy. After her discharge, Dr. Llewellyn continued conservative treatment for several months. However, after she failed to respond to this treatment, she was again hospitalized on October 25, 1987, and a myelogram was performed. In addition to confirming the earlier diagnosed problems, this myelogram revealed an additional abnormality at L4-5. On October 29, Dr. Llewellyn performed an anterior cervical discectomy and fusion of the disc at C5-6. Plaintiff was discharged on November 2, 1987 and continued under Dr. Llewellyn's post-operative care.
At the end of December, plaintiff had to be hospitalized again because of a marked worsening of pain in the cervical region following a particular incident during which she attempted to rise from bed one morning and felt a popping sensation in her neck and immediately began experiencing severe pain and headaches. Tests performed during her hospitalization revealed that the intensified pain was due to the bone fragment placed in her neck during the fusion having compressed and collapsed forward. This discovery necessitated the performance of another myelogram to ensure that additional bone fragments or tissue were not compromising the spinal canal. After a hospital stay of approximately twelve days, plaintiff was discharged with instructions to continue wearing a neck brace.
Thereafter, plaintiff's neck condition progressed slowly but satisfactorily. However, her back condition continued to worsen. Plaintiff was admitted to Methodist Hospital on July 10, 1988, where she underwent another cervical and lumbar myelogram. On July 15, 1988 a partial lumbar laminotomy was performed at L4-5 and L5-S1 and a partial discectomy at L4-5 and L5-S1. Plaintiff was discharged on July 21, 1988. At that time, Dr. Llewellyn assigned her a 22 percent disability of the body as a whole. As of the date of trial in February of 1989, plaintiff remained under Dr. Llewellyn's care.

ISSUES
1) Whether the trial court erred in granting a JNOV reducing plaintiff's assessment of comparative fault from 35 percent to 10 percent and correspondingly raising Wal-Mart's from 65 percent to 90 percent?
2) Whether the trial court erred in granting a JNOV increasing the amounts awarded to plaintiff for past and future pain and suffering, mental anguish, past and future loss income and earning potential and future medical expenses?
3) In the event we conclude the trial court erred in granting the JNOV raising *1151 plaintiff's damages, whether the jury abused its discretion in awarding excessive amounts for past and future loss income and future medical expenses?

LAW
A trial court may grant a JNOV only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach a contrary verdict. If there is substantial evidence opposed to the motion: i.e. evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986). In considering a motion for JNOV, the trial court must construe all evidence and reasonable inferences to be made therefrom in favor of the party opposing the motion. Trans Global Alloy v. First Nat. Bank, 564 So.2d 697 (La.App. 5th Cir.1990); Zeagler v. Dillard Dept. Stores, Inc., 521 So.2d 766 (La.App. 2d Cir.1988). Further, the trial court may not weigh the evidence, pass on credibility of witnesses or substitute its own judgment for that of the jury. Wooten v. Louisiana Power & Light Co., 477 So.2d 1142 (La.App. 1st Cir.1985). Basically, a JNOV can be granted by a trial court only when a jury's verdict is one which reasonable men could not have rendered. Adams v. Security Ins. Co. of Hartford, 543 So.2d 480 (La.1989). The standard to be applied by appellate courts in reviewing the grant of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous. Stafford v. Unsell, 492 So.2d 94 (La.App. 1st Cir.1986).

COMPARATIVE FAULT
In reviewing the trial court's JNOV on the issue of comparative fault the issue presented herein is whether the trial court erred in concluding that, given the evidence before the court, reasonable men could not have reached a verdict finding plaintiff 35 percent and Wal-Mart 65 percent at fault. In its reasons for judgment, the trial court concluded plaintiff "was guilty of a very small amount of negligence, if any."
After a thorough review of the record, we find that the trial court was manifestly erroneous in its conclusion. It is clear from the evidence that the jury could have reasonably found that plaintiff was 35 percent at fault and Wal-Mart was 65 percent at fault for the accident.
In reaching this conclusion, we are mindful of the jurisprudence to the effect that a customer in the display area of a retail store has a diminished duty to maintain a lookout because of the intentional distractions created by the displayed merchandise. Nevertheless, the customer still has a duty to exercise appropriate care for his own protection and cannot be oblivious to hazards observable with the exercise of reasonable care. See, Kimble v. Wal-Mart Stores, Inc., 539 So.2d 1212 (La.1989); Lloyd v. TG & Y Stores Co., 556 So.2d 629 (La.App. 2d Cir.1990); Ritchie v. S.S. Kresge Co., Inc., 505 So.2d 831 (La.App. 2d Cir.), writ denied, 507 So.2d 227 (1987).
In Kimble, a plaintiff who turned the corner of one aisle and stumbled over several toy rockers was found 25 percent at fault for his inattention, even though the rockers completely obstructed the aisle, leaving no room for passage. In Lloyd the plaintiff was also found to be 25 percent at fault when she slipped on a large, liquid spill, despite the fact that at the time she was hastening to a "blue light special" promoted by the store. The plaintiff in Ritchie slipped on a piece of clear cellophane lying in a store aisle and was assessed with 50 percent fault for failing to maintain a proper lookout and seeing what a reasonable person should have seen.
We believe that plaintiff's conduct in the present case constituted greater fault than that of the plaintiffs in any of the above cases. When questioned at trial regarding whether she saw the stack base before falling over it, she testified as follows:
Q You at no time saw this stack base before you fell over it, is that correct?
A I ain't saying I didn't see it. I am saying that I didn't pay attention to it if it was there. You know, I looked to *1152 my left, I looked to my right on the way down the aisle. When I got to where the rod and reels were, it caught my eyes. And it was on my left, but my buggy was up past where the rod and reels were and I took a step or two back to turn my buggy to go down the aisle and that is when I fell over the pallet.
Q Was there anything to have prevented you from seeing this had you looked?
A Pardon?
Q If you would have been walking with your buggy and you would have looked to your right where this stack base was, was there anything to prevent you from seeing it?
A I don't understand.
Q Was there anything to obstruct your view of this stack base had you decided to look to your right?
A No. No.
Q No?
A No.
Q You simply just never noticed the stack base before you fell over it, is that correct?
A No, sir, I guess I didn't.
The stack base which plaintiff failed to notice was 4x4 foot size and was stacked full of merchandise on one side. There was also a large sign on a 5 foot pole in the center of this stack base. The bottom portion of this stack base was black, contrasting with the light colored floor. Given these facts, we believe it would have been difficult for plaintiff to have failed to notice this stack base if she had been exercising reasonable care for her own protection.
Further, Ms. Hutchinson's fault consisted not merely of being inattentive and failing to see what she should have seen as did that of the plaintiffs in Kimble, Lloyd and Ritchie, but also in taking several steps backward without first ascertaining that her path was clear. There was nothing impelling plaintiff to act in haste and to have checked behind her would have taken her only moments.
Under these circumstances, we believe the verdict rendered by the jury on the issue of comparative fault was reasonably supported by the record. Given these facts, reasonable men could properly have assessed plaintiff with 35 percent fault. Further, the record also supports the assessment to Wal-Mart of 65 percent fault for the conduct of its employee in leaving a large portion of the stack base empty of merchandise and unattended, which the expert testimony indicated created a serious risk that a customer might trip over it. Defendant's own employees acknowledged the danger to customers created by an empty stack base and the fact that Wal-Mart's own internal safety procedures regarding stack bases were not followed in this instance. For the above reasons, we conclude the trial court improperly substituted its own judgment for that of the jury. Accordingly, we hereby reverse that portion of the JNOV reallocating the respective fault of plaintiff and defendant and reinstate the jury verdict assessing plaintiff with 35 percent fault and Wal-Mart with 65 percent fault.

QUANTUM
In granting JNOV the trial court increased the damages awarded to plaintiff as follows:[1]

 Jury Judge
Past Pain & Suffering $100,000.00 $200,000.00
Future Pain & Suffering $ 20,000.00 $100,000.00
Loss of Past Income & Income
 Potential $ 10,000.00 $ 30,000.00
Loss of Future Income &
Income Potential $ 50,000.00 $100,000.00
Future Medical Expenses $ 30,000.00 $150,000.00
Mental Pain & Anguish $ 15,000.00 $150,000.00

*1153 Defendant argues the trial court erred in rendering JNOV increasing these items of damages and that, in fact, even the amounts fixed by the jury for past and future lost wages and future medical expenses were excessive.
In reviewing a JNOV on the issue of quantum an appellate court must first determine whether the trial court committed manifest error in concluding the moving party was entitled to a JNOV. See Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (1985). If the JNOV was properly granted, an appellate court should not disturb the de novo award[2] made by the trial court unless the court abused its broad discretion in fixing the amount of the award. Acosta v. Pendleton Mem. Meth. Hosp., 545 So.2d 1053 (La.App. 4th Cir.), writs denied, 551 So.2d 637, 638 (1989); Roger v. Cancienne, 538 So.2d 670 (La.App. 4th Cir.), writ denied, 542 So.2d 1382 (1989). Even upon finding such an abuse of discretion, an appellate court may then only lower an excessive award to the highest amount (or raise an inadequate award to the lowest amount) which was reasonably within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Roger v. Cancienne, supra.
After careful examination of the present record in light of the above standards of review, we conclude: 1) the trial court properly granted JNOV as to the award made for future pain and suffering; 2) the JNOV as to the award for mental pain and anguish was properly granted but the trial court abused its discretion in making an excessive award; 3) the trial court erred in granting JNOV as to the awards made for past pain and suffering, past and future lost income and earning potential; and 4) the trial court erred in granting a JNOV raising the award for future medical expenses since the amount awarded by the jury was already excessive.

Lost Income
The evidence presented regarding plaintiff's past and future lost income and earning potential is capable of different interpretations such that it cannot be said reasonable persons could not differ. Accordingly, JNOV was not proper as to these items of damages. See Scott, supra. For instance, plaintiff's economist testified that her past lost earnings totalled $20,467.00 and her future lost earnings totalled $106,293.00. However, these figures were based on the assumption of plaintiff working year round at a full-time job. Yet, plaintiff acknowledged that in the years prior to her accident she did not work on a regular basis. Further when she did work, usually harvesting crops, it was often part-time and only for the duration of the harvest season from approximately April to November. In fact, plaintiff was not working at the time of her accident on September 2, 1986 and testified she had no plans at that time to seek full-time employment. Under the circumstances, the awards made by the jury for plaintiff's past and future lost income and earning potential were reasonable and within the jury's broad discretion. The trial court erred in granting a JNOV as to these awards.

Pain and Suffering
The pain and suffering experienced by plaintiff in the period between the date of her injury and trial was substantial. However, we believe the $100,000.00 *1154 awarded by the jury to compensate plaintiff for her pain and suffering during this approximate 2½ year period was within the jury's broad discretion. It is critical that this award was for plaintiff's past pain and suffering only; plaintiff received separate awards for her future pain and suffering and for her mental anguish.
Given the magnitude of plaintiff's suffering, the record might well have supported a higher award for past pain and suffering if the jury had chosen to render it. However, we believe the $100,000.00 award made by the jury was a verdict which reasonable men could have rendered under the evidence and was within the jury's discretion. The trial court erred in rendering JNOV substituting its own judgment for that of the jury.
However, we believe the JNOV was proper to the extent that it increased the award for future pain and suffering from $20,000.00 to $100,000.00. The evidence indicated plaintiff remained on pain medication for her back at the time of trial and that it was still necessary for her to continue wearing a back brace. She testified she also experienced frequent headaches and difficulty in sleeping. Dr. Llewellyn, plaintiff's treating physician, testified it was likely that plaintiff, who was only thirty-nine at the time of trial, would continue to suffer some pain, as well as experiencing discomfort upon performing certain activities for the remainder of her life.
In view of this evidence, we find no manifest error or abuse of discretion in the JNOV rendered by the trial court raising plaintiff's award for future pain and suffering.

Future Medical Expenses
With respect to the award made for future medical expenses, defendant argues that not only did the trial court err in granting a JNOV increasing the jury award, but that the jury award itself was excessive. We agree.
Although plaintiff had not been released from Dr. Llewellyn's care at the time of trial, there was sparse evidence presented as to any future medical treatment she might require. The only specific evidence in the record that she would require any future medical care was the following testimony of Dr. Llewellyn:
Q Doctor, assuming that Dale [plaintiff] is on target for improvement ... do you anticpate (sic) that she will have the need of further medical care?
A Yes, sir. She would, I feel, benefit from three perhaps, maybe four perhaps, maybe two visits a year with an orthopedist or neurosurgeon to encourage her referable to increasing her activities physically or decreasing them, perhaps checking the bone structures that might change in a female in her age group, and to provide her with supportive medicines that she would likely require from time to time.
Q Doctor, do you feel that she would require this two, three, or four visits with a neurosurgeon or orthopedic surgeon a year on an ongoing basis for the rest of her life?
A Yes, sir, I feel that is a fairly proper statement for her to consider or that I have told her at the present time.
Thus, while the record establishes that plaintiff will incur future medical expenses, we do not believe it supports even the $30,000.00 amount awarded by the jury for future expenses. We find the highest amount which reasonably could have been awarded under the circumstances for this element of damages is $15,000.00.

Mental Pain and Anguish
The evidence revealed that, as a result of experiencing substantial pain over a prolonged period of time, as well as facing the prospect of continuing to suffer some pain for the remainder of her life, plaintiff became despondent, listless and had difficulty in sleeping. As a result, her relationships with both her husband and child, in whom she no longer took any interest, were adversely affected. Several family members, as well as plaintiff herself, testified as to the drastic change in plaintiff's personality; whereas she had formerly been an active, cheerful person, they testified she became *1155 depressed and largely inactive following the accident.
Plaintiff's mental condition deteriorated to the point that in November of 1987 she consulted a psychiatrist, Dr. Richard Stroback, who diagnosed her as suffering from a major depression. Dr. Stroback immediately placed plaintiff on anti-depressants and at one point found it necessary to prescribe a dosage near the maximum allowed. According to Dr. Stroback, an area of major concern to plaintiff was her perception that she was no longer a good wife and mother. Plaintiff remained in treatment with Dr. Stroback for over three months until February, 1988.
Both the lay and medical evidence indicates plaintiff suffered mental anguish to such an extent as to justify the grant of the JNOV by the trial court. However, we believe the trial court abused its discretion in raising the award to $150,000.00. Although plaintiff's depression was severe enough to require medical treatment, after a period of three months her psychiatrist felt it was in remission. There is no evidence that she has sought any further treatment for depression since that time. Further, while plaintiff's relationship with her husband and daughter have been strained, it appears these relationships are still strong. Thus, the record simply fails to support an award of $150,000.00. We must therefore reduce the trial court's award to the highest amount reasonably within the court's discretion, Roger v. Cancienne, supra, which we believe, under the circumstances, to be $50,000.00.

CONCLUSION
For the reasons assigned, it is decreed that:
1) The portion of the JNOV reducing plaintiff's percentage of fault from 35 to 10 percent and raising defendant's percentage of fault from 65 to 90 percent is reversed and the jury verdict assessing 35 percent fault to plaintiff and 65 percent fault to Wal-Mart is hereby reinstated;
2) The portions of the JNOV raising the jury awards for past pain and suffering, past lost income and future lost income are reversed and the jury verdict as to these elements of damages is reinstated;
3) The JNOV as to the award for mental pain and anguish is amended to reduce the amount awarded to $50,000.00;
4) That portion of the JNOV raising plaintiff's award for future medical expenses is reversed and, further, the jury verdict as to this element of damages is amended to reduce it to $15,000.00;
5) The judgment of the trial court is affirmed in all other respects.
To recapitulate, plaintiff is awarded the following damages subject to a 35 percent reduction:

Past Pain & Suffering $100,000.00
Future Pain & Suffering $100,000.00
Loss of Past Income & Income
 Potential $ 10,000.00
Loss of Future Income &
 Income Potential $ 50,000.00
Past Medical Expenses $ 60,000.00
Future Medical Expenses $ 15,000.00
Mental Pain & Anguish $ 50,000.00
 ___________
 $385,000.00

Plaintiff is assessed all costs of this appeal.
AFFIRMED IN PART; AMENDED IN PART AND REVERSED IN PART.
NOTES
[1] The only item of damages not increased by the trial court was the $60,000.00 award made for past medical expenses.
[2] Once a trial court makes a decision to grant a JNOV on the issue of quantum, it is not bound by the standard for appellate review of damage awards provided in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), but should render a de novo award based on its own independent assessment of the plaintiff's damages. Rickerson v. Fireman's Fund Ins. Co., 543 So.2d 519 (La.App. 1st Cir.1989).