648 So.2d 411 (1994)
Larry Colon MAYNOR, Plaintiff-Appellant,
v.
William VOSBURG, et al., Defendant-Appellees.
No. 25922-CA.
Court of Appeal of Louisiana, Second Circuit.
November 28, 1994.
Rehearing Denied January 19, 1995.
*414 James R. Clary, Jr., Robert H. Schmolke, Baton Rouge, Robert Levy, Ruston, for appellant Larry Colon Maynor.
Hudson, Potts & Bernstein by Brady D. King, II, Monroe, for appellees Vosburg, E. LeeYoung & Co., Inc. and Cas. Reciprocal Exchange.
Theus, Grisham, Davis & Leigh by F. William Sartor, Jr., Monroe, for appellee Nat. Union Fire Ins. Co.
Charles S. Norris, Jr., Monroe, for appellee R.L.I. Ins. Co.
Before MARVIN, SEXTON, NORRIS, LINDSAY and BROWN, JJ.
BROWN, Judge.
Plaintiff, Larry Colon Maynor, appeals from a judgment based on a jury verdict granting him damages of $33,589 for injuries sustained when his 18-wheeler was struck by a pick-up truck driven by defendant, Michael Young Vosburg. Maynor argues that the award is inadequate to compensate him for the back injury caused by the accident. The various defendants appealed and answered Maynor's appeal, complaining, among other things, that the jury's allocation of fault was erroneous and that Maynor should be assessed with some degree of comparative fault.
For the reasons set forth below, we amend in part and as amended, affirm.

FACTS
The accident occurred on I-20 in Ruston, Louisiana, on June 15, 1989. Plaintiff, Larry Maynor, a truck driver for Reeves Transportation Company, was driving west in his tractor-trailer *415 rig. Defendant, Michael Vosburg, who was a minor at the time of the accident, was entering westbound traffic on I-20 from the Highway 167 entrance ramp. Vosburg, an employee of his grandfather's business, E. Lee Young & Company, Inc., was driving a pick-up truck owned by the company and insured by Casualty Reciprocal Exchange Insurance Company (C.R.E.).
According to Vosburg, he sideswiped Maynor's 18-wheeler while trying to pass or avoid a white car that stopped ahead of him on the entrance ramp. Contact was made between the right front fender of Maynor's 18-wheeler and the left rear bumper of Vosburg's pick-up.
Maynor finished his route and waited until returning to his home in South Carolina before seeking medical treatment on June 20, 1989. Maynor initially saw Dr. Anthony Hucks-Folliss, who initiated a program of conservative treatment. Subsequently, Maynor consulted Dr. Samuel Chewning, who recommended surgery. However, Maynor decided not to have surgery at that time.
Maynor consulted Dr. George Ferre in November 1990, and in January 1991, Dr. Ferre performed a lumbar laminectomy at the L-4, L-5 level. In August 1991, Dr. Ferre performed a second surgery at the L-5, S-1 level and a third surgery was performed in September 1991. None of these surgeries was deemed successful.
Maynor filed suit against Michael Vosburg and his father, William Vosburg. Also named as defendants were Vosburg's employer, E. Lee Young & Company, and its insurer, C.R.E., in addition to R.L.I. Insurance Company, which had issued a personal umbrella liability policy to Vosburg's father. Reeves Transportation's workers' compensation insurer, National Union Fire Insurance Company, intervened, seeking reimbursement of the workers' compensation benefits paid to Maynor as a result of the accident.
A lengthy jury trial concluded on October 14, 1992. The jury assessed 85% fault to Vosburg and 15% to "any other person" (the unknown driver of the white car). The jury awarded Maynor general damages of $15,000 and special damages of $18,589, a total award of $33,589.
Prior to trial, the trial court ruled that the C.R.E. insurance policy provided primary coverage and would pay the first $250,000. However, the trial court found that the R.L.I. policy was not a "true" excess policy and held that the C.R.E. and R.L.I. policies would provide concurrent coverage for any amounts in excess of $250,000 up to $1,750,000, with C.R.E. paying 43% and R.L.I. paying 57%.
Maynor appealed, contending that the jury erred in failing to find Vosburg 100% at fault in causing the accident and in awarding inadequate damages. He also asserts that the trial court erred in allowing defendants' accident reconstruction expert to testify as to the "minimal property damage" to Maynor's 18-wheeler. Intervenor, National Union, appealed, adopting Maynor's arguments as its own.
R.L.I. appealed and answered Maynor's appeal, asserting that the jury erred in not assessing comparative fault of at least 30% to Maynor and 50% to "any other person." R.L.I. also contends that the trial court erred in finding that its policy was not a true excess policy and that it should pay concurrently with C.R.E.
The Vosburgs, E. Lee Young & Company, and C.R.E. answered the appeal and appealed devolutively, arguing that the jury erred in finding the driver of the white car only 15% at fault and in absolving Maynor of all fault. Defendants also complain of the trial court's denial of C.R.E.'s claim against R.L.I. for reimbursement of court costs, attorney fees and expert witness fees incurred by C.R.E. in defense of their mutual insureds while R.L.I. sought to deny coverage. C.R.E. asserts that R.L.I. should bear an equal share of the costs.

APPORTIONMENT OF FAULT
Each litigant takes issue with the jury's apportionment of fault. Maynor asserts that Vosburg should be held 100% liable for the accident. Defendants argue that Maynor should be assessed with some fault *416 and that the phantom white car should be assigned a greater percentage of fault.
Testimony about the circumstances surrounding the collision was given by three witnesses: Larry Maynor; his passengertrainee, Joanne Buck; and Michael Vosburg.
Larry Maynor testified that on June 15, 1989, he was driving his tractor-trailer rig west on I-20 on his way to deliver a load of carpet to Lubbock, Texas. While driving through Ruston, because of heavy traffic and the number of entrance and exit ramps, Maynor was driving approximately 50 m.p.h. in the westbound, left lane. Maynor observed two vehicles, a white car and the pick-up truck driven by Vosburg, approaching I-20 on the ramp entering the westbound interstate from Highway 167. Accordingly, Maynor took his foot off the gas pedal and began to tap the brake. Maynor testified that the pick-up truck attempted to pass the white car, which by that time was in the outside, right lane of the interstate. However, there was not enough room between the white car and Maynor's 18-wheeler for Vosburg to pass and while Vosburg was attempting to pass the white car, the rear of Vosburg's pick-up collided with the right front corner of Maynor's rig.
Maynor testified that after the impact, he grabbed the steering wheel, "stood on the brakes and held on." As demonstrated by the skid marks, which were about 281 feet long, Maynor was able to keep his vehicle primarily within his lane of traffic and bring the rig to a controlled stop.
At the time of the accident, Maynor's passenger, Joanne Buck, was a trainee in Reeves Transportation's driving program. Ms. Buck testified that Maynor's rig was traveling in the left lane of I-20 closest to grassy median. She also testified that there was another vehicle, presumably the white car, in the right lane slightly in front of the rig. The pick-up truck coming from the ramp tried to squeeze between Maynor's 18-wheeler and the other car. However, because the pick-up driven by Vosburg was going too fast and there was no room to pass, it ran into the front of the 18-wheeler. After hitting the rig, Vosburg lost control of his pick-up truck, which flipped several times and stopped in the path of Maynor's rig. Maynor applied his brakes and was able to stop the 18-wheeler before it struck the pickup truck again. Ms. Buck testified that the other car apparently saw the pick-up truck and tried to accelerate out of the way.
Michael Vosburg testified that he was driving on the entrance ramp to I-20 when the white car ahead of him slowed down and came to a "rolling stop" in the merge lane. He testified that there were no other vehicles in the immediate area to precipitate such a stop. Vosburg admitted that he probably could have stopped behind the white car, but he chose not to do so.
According to Vosburg, after he checked and saw no traffic in the outside lane, he entered the interstate. The white car tried to enter the same lane. In order to avoid the white car, Vosburg got into the left, inside lane. Vosburg stated that he never saw Maynor's 18-wheeler prior to the collision.
Apportionment of fault is a factual matter and the trier of fact's findings will not be disturbed on appeal unless they are manifestly erroneous or clearly wrong. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1983), U.S. cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Davis v. L.J. Earnest, Inc., 25,368 (La.App. 2d Cir. 01/19/94), 631 So.2d 63; Devereux v. Allstate Insurance Co., 557 So.2d 1091 (La. App. 2d Cir.1990).
According to Michael Vosburg, the white car ahead of him stopped in the merge lane unnecessarily because there was no oncoming traffic. The only vehicle approaching was Maynor's 18-wheeler, which was in the far lane. Vosburg's attempt to pass and merge onto the interstate ahead of the white car demonstrated extremely poor judgment that merits imposition of the greater percentage of fault. However, if Vosburg's testimony is credible, the driver of the "phantom" white car, in coming to a virtual stop when he should have been accelerating in order to merge with the I-20 traffic, also exhibited poor judgment and created an unsafe situation. Therefore, we find that the jury's apportionment of 15% fault to this driver does not constitute manifest error.
*417 Furthermore, our review of the record fails to demonstrate any evidence of fault on the part of Larry Maynor, who acted as prudently as possible under the circumstances presented. In fact, Maynor's quick response to the unexpected collision allowed him to bring his 18-wheeler to a stop before it could strike Vosburg's pick-up, which was out of control ahead of Maynor. The jury did not err in its allocation of fault.

EXPERT TESTIMONY: MINIMAL PROPERTY DAMAGE
Maynor also contends that the trial court erred in allowing Dr. Anthony J. Galli, defendants' reconstruction expert, to testify that Maynor's 18-wheeler sustained only minimal property damage, thus establishing that the minimal force of the collision could not have caused his injuries. Maynor maintains that such evidence was confusing and misleading and should not have been presented to the jury, primarily relying on Starnes v. Caddo Parish School Board, 598 So.2d 472 (La.App. 2d Cir.1992). In Starnes, we noted that the court has avoided the precedent of trying to measure an injury in direct proportion to the force of a collision when medical experts and lay witnesses establish that a plaintiff has sustained injuries.
In its opinion denying plaintiff's motion in limine to exclude evidence of minimal force and/or property damage, the trial court noted that such evidence is relevant because causation is a primary issue in this case. We note that the trial court is afforded wide discretion in determining relevant evidence and its ruling will not be disturbed absent a clear abuse of this discretion. State v. Mosby, 595 So.2d 1135 (La.1992); Laing v. American Honda Motor Co., Inc., 628 So.2d 196 (La.App. 2d Cir.1993), writ denied, 94-0375 (La. 03/25/94), 635 So.2d 239.
The trial court instructed the jury as follows:
You should consider all facts and circumstances bearing on the issue of causation, such as the testimony of medical experts and lay witnesses. You may also consider the force of collision, but you should not attempt to measure an injury in direct proportion to the degree of force of the collision, nor should you consider the force of the collision as the only determining factor in assessing the severity of the plaintiff's injuries, if any. Thus if the plaintiff proves by a preponderance of the evidence through testimony of medical experts and lay witnesses that he sustained injury as a result of the collision, the degree of force of the collision is of no material importance. (Emphasis added).
The evidence presented by defendants relating to the severity of the collision was relevant to the issue of causation and the jury was carefully instructed as to the proper use of such evidence. The trial court did not err in allowing Dr. Galli's testimony on the issue of the force of the collision.

DAMAGES
Maynor contends that the jury committed manifest error by awarding inadequate damages. Defendants argue that the jury adequately compensated Maynor for soft tissue injuries of six-month duration.

Applicable Legal Principles
An appellate court may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State of Louisiana through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989); Whitaker v. Mullinax, 628 So.2d 222 (La.App. 2d Cir.1993), writ denied, 94-0382 (La. 03/25/94), 635 So.2d 241. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, supra; Dismuke v. Quaynor, 25,482 (La. App. 2d Cir. 04/05/94), 637 So.2d 555, writ denied, 94-1183 (La. 07/01/94), 639 So.2d 1164.
In a suit for personal injuries, the plaintiff has the burden of establishing by a preponderance of the evidence a causal relationship between the accident and his subsequent injuries. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991). The test for determining the causal relationship between the accident and subsequent injuries is whether the plaintiff proved, through medical testimony, *418 that it was more probable than not that subsequent injuries were caused by the trauma suffered in the accident. Mart v. Hill, 505 So.2d 1120 (La.1987); Starnes, supra. As noted by the supreme court in Lasha, supra, whether defendant's fault was a cause-in-fact of plaintiff's injuries may also be proved by other direct or circumstantial evidence. Id. at 1005.
Plaintiff's disability is presumed to have resulted from an accident if, before the accident, he was in good health but, beginning with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. Dabog v. Deris, 625 So.2d 492 (La. 1993); Housley v. Cerise, 579 So.2d 973 (La. 1991); Harig v. State Board of Elementary & Secondary Education, 25,702 (La.App.2d Cir. 03/30/94), 635 So.2d 485; Durkee v. City of Shreveport, 587 So.2d 722 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La. 1991).
Once plaintiff establishes the prerequisites for the application of the presumption of a causal relationship, defendant has the burden of producing evidence to persuade the trier of fact that it is more probable than not that plaintiff's injuries did not result from the accident or that the accident did not accelerate, aggravate or combine with a preexisting condition to produce plaintiff's disability. Morris v. Allstate Insurance Co., 25,148 (La.App. 2d Cir. 02/23/94), 632 So.2d 1209, writ denied, 94-1044 (La. 06/17/94), 638 So.2d 1099; Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991).

Evidence
Dr. Anthony Hucks-Folliss, a neurosurgeon, treated Larry Maynor immediately upon his return to South Carolina following the accident. Maynor saw Dr. Hucks-Folliss on six occasions between June 20, 1989, and December 26, 1989. During this time, Dr. Hucks-Folliss prohibited Maynor from returning to work and treated his complaints of low back, hip and leg pain conservatively by prescribing medication and physical therapy. Because Maynor's complaints continued, Dr. Hucks-Folliss referred him to Dr. Samuel Chewning, who recommended surgery after ordering a discogram. Maynor declined the surgery. Dr. Hucks-Folliss stated that it was more likely than not that Maynor's low back, hip and leg pain was caused by or related to the accident of June 15, 1989.
On October 1, 1990, still plagued by low back and leg pain, Maynor consulted Dr. Stephen Gardner, a neurosurgeon, for a second opinion. Dr. Gardner reviewed the discogram ordered by Dr. Chewning and noted degenerative changes at L4-L5 and L5-S1. Also, at L4-L5, Dr. Gardner noted evidence of disc disruption. Dr. Gardner stated that it was not possible that Maynor's low back pain was caused by degenerative changes. It was Dr. Gardner's opinion that Maynor's pain was caused by trauma sustained as a result of the automobile accident. Dr. Gardner further opined that Maynor's low back condition was aggravated by the accident.
Upon the recommendation of a neighbor, Maynor went to see Dr. George Ferre, an orthopedic surgeon. Dr. Ferre conducted a series of tests and found herniated discs at two levels. Dr. Ferre performed three surgeries, all unsuccessful. Dr. Ferre concluded that Maynor's condition was causally related to the accident of June 15, 1989, and noted the possibility that a fourth fusion surgery would be required. Dr. Ferre estimated that Maynor has a spinal impairment of 30-35%.
Dr. Hugh Queen, Maynor's general practitioner, had treated Maynor for neck and shoulder pain in August 1988. Dr. Queen noted that Maynor responded well to conservative treatment and was released to return to work after only six weeks of treatment. Dr. Queen treated Maynor after his accident in June 1989, though not for complaints related to or arising out of the accident. Maynor mentioned his low back problems to Dr. Queen, whose records show that Maynor's low back complaints did not begin until after the accident in June 1989.
Defendants had Dr. Frank Cline examine Maynor for purposes of trial. After only one examination, Dr. Cline concluded that Maynor's *419 lumbar problems were completely unrelated to the automobile accident, but were probably caused by his occupation or age. Dr. Cline opined that he was in the best position to testify concerning the causal connection between Maynor's accident and subsequent back complaints because he had Maynor's complete history and access to the records and reports of Maynor's treating physicians.
Larry Maynor testified that before the June 1989 accident, he never had lower back problems. He testified that he saw a chiropractor for muscle tightness four times over a six-day period in 1983 after a rough threeweek cross-country haul. Maynor stated that in 1988 he injured his neck and shoulder when he violently jerked the steering wheel of his rig to avoid a collision on I-20 in Shreveport. He stated that he did not injure his back as a result of that incident; this statement is supported by his treating physician's testimony and medical records.
As to the June 1989 accident in Ruston, Maynor testified that after impact with Vosburg's pick-up truck, he forcibly held the steering wheel while placing both feet on the brakes to stop his 18-wheeler. According to Maynor, it felt like he had "run into a brick wall." Maynor did not notice pain in his back until several hours after the accident. He described the pain as being near the center of his lower back down through his right leg.
When he returned home on June 20, 1989, Maynor went to see Dr. Hucks-Folliss, who had treated him when he injured his shoulder and neck in 1988. Dr. Hucks-Folliss treated him conservatively for several months and sent him to see Dr. Chewning, who ordered a discogram. Maynor testified that he refused the surgery recommended by Dr. Chewning.
Maynor testified that the pain became progressively worse and that he consulted Dr. Ferre upon a neighbor's recommendation. Dr. Ferre performed three surgeries, none of which relieved his lower back and leg pain.
Joanne Buck, who was riding with Maynor at the time of the accident, testified that Maynor was a healthy, vigorous man before the June 1989 accident. She said that Maynor had never complained of back pain and was in good health prior to the accident. She first heard Maynor complain of back pain two to three hours after the accident. Ms. Buck stated that Larry Maynor applied his brakes very hard before and after the impact with Vosburg's truck. Ms. Buck testified that the trip to Lubbock, Texas, and the return trip back to South Carolina took an unusually long time because Maynor made frequent stops to relieve the pain in his back.
Defendants introduced the videotaped deposition of Celeste Maynor, who was married to Larry Maynor from 1981 to 1989. Ms. Maynor testified that Maynor had some complaints of back pain while working in 1983. In connection with this back pain, Maynor saw a chiropractor approximately four times.
Although she did not remember the details, Ms. Maynor testified that she was aware that Maynor was involved in an accident in 1988 and would rub his lower back and complain occasionally. Aside from this incident, Celeste Maynor stated that Maynor never missed work because of problems with his back. Ms. Maynor stated that her former husband did not have chronic back pain or continuing lower back problems.

Discussion
The jury announced its verdict in the form of answers to special interrogatories. The jury found that Michael Vosburg and the driver of the phantom white car were negligent and that their fault, 85% and 15% respectively, was the cause-in-fact of the harm suffered by Larry Maynor.
After concluding that Maynor was injured in the accident, the jury awarded $18,589 in special damages (lost wages and medical expenses) and $15,000 in general damages. The jury's award covered only medical expenses incurred and wages lost immediately after the accident. Its award of general damages likewise reflects the jury's conclusion that Maynor's disc condition, which required three surgeries, was not caused by the automobile accident. On this record, the jury was clearly wrong in limiting its award.
None of the medical and lay testimony supports the jury's determination that Maynor *420 only suffered slight injuries of brief duration in the accident. Defendant's expert, Dr. Cline, who saw Maynor only once and reviewed Maynor's medical records for the purpose of testifying, emphatically opined that Maynor was not injured in the June 1989 accident and that the accident had "no significant effect" on Maynor. By finding that Maynor sustained injuries as a result of the accident, the jury implicitly rejected Dr. Cline's opinion that Maynor's complaints were completely unrelated to the accident.
The other doctors who testified had treated Maynor and categorically disagreed with Dr. Cline. Dr. Hucks-Follis, a neurosurgeon, concluded that Maynor's low back, hip and leg pain in 1989-90 was, more likely than not, caused by or related to the June 1989 accident. Dr. Hucks-Follis referred Maynor to Dr. Chewning, a neurosurgeon, who recommended lumbar disc surgery to Maynor.
Dr. Gardner, another consulting neurosurgeon who reviewed Dr. Chewning's records for the purpose of rendering a second opinion, stated that Maynor's disc problems were aggravated by the June 1989 accident and that it was not possible that they were caused solely by degenerative changes. Dr. Ferre, the orthopedic who performed the three surgeries, squarely related the cause of those surgeries to the June 1989 accident.
After reviewing the evidence, especially Maynor's uncontradicted testimony regarding his low back complaints, we find that the jury was clearly wrong in determining that there was no causal connection between the accident and Maynor's subsequent disc condition. Furthermore, the jury was clearly wrong in not applying the Housley presumption.
Maynor was in relatively good health while working as a truck driver before the June 1989 accident. Maynor's low back symptoms arose within hours of the accident and progressively worsened. He received immediate and consistent medical treatment during the months before his surgeries. The medical and lay evidence preponderates in favor of the reasonable conclusion that Maynor's disabling low back condition was caused or aggravated by the accident.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the factfinder abused its discretion in making its award. American Motorist Insurance Co., supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Durkee, supra. Based upon our finding that Larry Maynor's disc condition is causally connected to the automobile accident, we find that the jury's award of medical expenses, lost wages and general damages is grossly inadequate. Furthermore, we find error in the jury's failure to make an award for loss of earning capacity.
Once it is determined that the trier of fact is clearly wrong, the appellate court is empowered by LSA-C.C.P. Art. 2164 to render any judgment which is just, legal and proper. Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985); Beckham v. St. Paul Fire & Marine Insurance Co., 614 So.2d 760 (La.App. 2d Cir. 1993). In cases where the appellate court is compelled to modify an inadequate award of damages, the award will only be raised to the lowest point that is reasonably within the trier of fact's discretion. Theriot v. Allstate Insurance Co., 625 So.2d 1337 (La.1993); Coco, supra; Durkee, supra.

General Damages
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life or lifestyle that cannot be measured definitively in terms of money. Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978); Whitaker, supra; Beckham, supra.
Larry Maynor consulted several doctors and was treated conservatively without success for approximately 18 months following the June 1989 accident. Because of intensified and continuous pain, Maynor consulted Dr. George Ferre in November 1990. After a series of tests, Dr. Ferre diagnosed nerve root compression and a disc rupture at L5-S1 and a disc herniation at L4-L5.
Surgery was performed in January 1991. Because of continued pain, stiffness and limitation *421 of motion, Dr. Ferre ordered another MRI, which revealed scarring at L4-L5 and disc herniation at L5-S1. Maynor's pain worsened and surgery to remove the second herniated disc was performed. A third surgery was undertaken to remove bone growth and scarring.
Dr. Ferre testified that Maynor has chronic back pain and that the three back surgeries were unsuccessful. Dr. Ferre gave Maynor a 30-35% spinal impairment rating and opined that Maynor will never be able to return to work as a truck driver. Dr. Ferre further stated that Maynor is disabled for the purposes of manual labor.
Larry Maynor testified that he is unable to work or engage in hobbies previously enjoyed because of lower back and leg pain. Maynor cannot perform household chores or work in his yard. His bladder control has been affected and he sometimes urinates on himself. Maynor stated that he has lost the ability to function sexually.
After a review of awards in similar cases, we conclude that a general damage award in the amount of $150,000 is the lowest amount within the range of the jury's discretion for Larry Maynor's injuries, two herniated discs requiring three surgeries, none successful, and resulting in a permanent impairment and an inability to work.[1]
Loss of Earnings and Earning Capacity
Lost earnings need not be precisely proven, but they must be shown with reasonable certainty. Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2d Cir.1992), writs denied, 599 So.2d 316, 317 (La.1992); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). Damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). An award for lost past wages can be computed on the amount the plaintiff would have in all probability been earning at the time of trial. Coco, supra. To recover, a plaintiff must show proof to reasonably establish his claim. Weber v. Brignac, 568 So.2d 1129 (La.App. 5th Cir.1990).
Damages for loss of earning capacity should be based on the injured person's ability to earn, rather than what he actually earned before the injury. Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Laing, supra; Bacle v. Wade, 607 So.2d 927 (La. App. 2d Cir.1992). In computing loss of future income, it is necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury. A determination must also be made of whether plaintiff has been disabled from work for which he is fitted by training and experience. Laing, supra; Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir.1988).
Dr. William Stewart, professor of vocational rehabilitation services at the University of South Carolina, conducted a clinical occupational rehabilitation interview with Maynor on April 8, 1992. Scores from tests administered by Dr. Stewart reveal that Maynor is functionally illiterate, though his math skills are at the ninth grade level. Maynor's performance on a bimanual dexterity work sample test reveals that he experiences pain while sitting and using his upper body. Maynor requires a frequent change of body position and his lack of dexterity prevents him from piece work or production type employment.
*422 Dr. Stewart noted Maynor's desire to return to work. Also, according to Dr. Stewart, one of Maynor's vocational strengths is his outstanding employment record. However, he feels that Maynor is totally disabled for employment purposes because of his lack of work stamina and endurance, physical disabilities, constant pain and depression, and inability to read or write. Based on the severity of Maynor's problems, Dr. Stewart opined that it was unlikely that occupational rehabilitation would be successful. Furthermore, Dr. Stewart noted that there is no expectation of future employability for Maynor.
Dr. Luther Diehl, clinical psychologist, performed a clinical evaluation of Maynor on May 11, 1992. Maynor's scores on several standardized tests reveal extreme difficulty in reading and writing. According to Dr. Diehl, Maynor's functional illiteracy makes retraining very difficult. Dr. Diehl's diagnostic impression of Maynor was major depression, which he attributes to the accident. Maynor's objective symptoms were insomnia, lack of interest in formerly enjoyed activities and decreased interest in sex and romantic relationships.
Dr. Diehl saw Maynor again on October 1, 1992. At this time, he noted Maynor's feelings of hopelessness because of his inability to read and write. Maynor is aware of his limitations and he feels that he doesn't have many alternatives. Dr. Diehl stated that Maynor's pain and resulting depression make it hard for him to concentrate. Dr. Diehl opined that the prognosis is poor for Maynor's resumption of any type of gainful employment given his limitations.
Dr. Randy Rice, professor of economics at Louisiana State University, calculated Maynor's past lost wages from time of injury through trial based on Maynor's 1989 year-to-date earnings as $95,959. Dr. Rice also calculated the present value of Maynor's lost future earnings as $384,692.
Dr. Ernest Moser, economist, testified for defendants. Dr. Moser calculated Maynor's past lost wages from injury through trial based on Maynor's income for the first half of 1989 and previous tax returns. Dr. Moser's figure for past lost wages was $76,719.92. For loss of earning capacity, Dr. Moser calculated the present value of Maynor's future loss as $297,486.24.
Dr. Diana Herbst, vocational rehabilitation expert, noted that Maynor exhibited very little ability in most employment areas. Dr. Herbst also stated that Maynor is limited by his functional illiteracy, physician's restrictions and the non-transferability of his truck driving skills to other occupations.
Based on the above testimony, we find that Maynor is entitled to an award of $85,000 for past lost wages and $345,000 for loss of earning capacity.

Medical Expenses
Medical expenses, past and future, which are incurred by an injured plaintiff, are recoverable as an element of damages. Thames v. Zerangue, 411 So.2d 17 (La.1982). The record contains uncontroverted evidence of Maynor's past medical expenses in the amount of $55,165.58, which are recoverable in full.

INSURANCE COVERAGE
R.L.I. argues that the trial court erred in concluding that its policy was not a true excess policy and in finding that the R.L.I. policy would pay concurrently, on a pro-rated basis, with the C.R.E. policy for any amount over $250,000 up to $1,750,000.
At the time of the accident, a C.R.E. business auto policy with liability limits of $1,000,000 covered E. Lee Young & Co., Inc., Michael Vosburg's employer. The truck involved in the accident was listed as a covered auto on the C.R.E. policy. Also in effect on the date of the accident was a personal umbrella liability policy issued by R.L.I. to William E. Vosburg, Michael's father.
Prior to trial, the court found that the C.R.E. policy provided primary coverage for the first $250,000 and that the R.L.I. policy was not a true excess policy. The trial court further held that the C.R.E. and R.L.I. policies provided concurrent coverage for any amount over $250,000 up to $1,750,000, with C.R.E. paying 43% and R.L.I. paying 57% of any amount within that range.

*423 Applicable Legal Principles

An insurance policy is a contract between the parties and is to be construed by applying the general rules of interpretation of contracts set forth in Louisiana's Civil Code. Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., 93-0911 (La. 01/14/94), 630 So.2d 759; Smith v. Matthews, 611 So.2d 1377 (La.1993); Benton v. Long Manufacturing N.C., Inc., 550 So.2d 859 (La.App. 2d Cir.1989). Contractual interpretation is the determination of the common intent of the parties. LSA-C.C. Art. 2045; Lindsey v. Poole, 579 So.2d 1145 (La.App. 2d Cir.1991), writ denied, 588 So.2d 100 (La.1991).
The parties' intent, which is reflected by the language of the insurance policy, determines the extent of coverage. L.I.G.A., supra; Pareti v. Sentry Indemnity Co., 536 So.2d 417 (La.1988). An insurance policy should not be interpreted in a manner that would enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or which would lead to an absurd conclusion. L.I.G.A., supra; Lindsey, supra. As long as there is no conflict with statutory provisions or public policy, insurers can limit their liability and obligations in a given policy. Lindsey, supra; Benton, supra.
In L.I.G.A., supra, the issue before the supreme court was whether an excess insurance policy provided drop down coverage as a result of the primary insurer's insolvency. It was noted that in determining the extent of excess coverage, courts have looked beyond the policy language to other factors, such as the premiums paid and the purpose and nature of excess insurance. Id. at 768. See also Benton, 550 at 861, fn. 2.
An insured purchases excess insurance to provide supplemental coverage that picks up where his primary coverage ends and thus provide protection against catastrophic losses. L.I.G.A., supra; Lindsey, supra; Coates v. Northlake Oil Co., Inc., 499 So.2d 252 (La.App. 1st Cir.1986), writ denied, 503 So.2d 476 (La.1987). The very nature of excess insurance coverage is such that a predetermined amount of underlying primary coverage must be paid before the excess coverage comes into play. The existence of underlying primary coverage both reduces the risk assumed by the excess insurer and translates into a reduced premium for the insured. L.I.G.A., supra. The reduced premium reflects the parties' intent that excess coverage attaches only after a predetermined amount of primary coverage has been exhausted. Id.; Benton, supra.

Discussion
Our application of the above legal principles to the insurance policies in this case demonstrates that the trial court erred in failing to classifying the R.L.I. policy as a true excess policy and in finding that R.L.I. provided primary coverage.
The C.R.E. policy's "other insurance" clause provides that the policy is primary for any covered auto owned by the insured. It is undisputed that the truck involved in the accident is such an auto. The C.R.E. policy also contains a "pro-rata" clause, which provides that when C.R.E.'s policy and another policy cover a claim on the same basis, C.R.E. will pay its share, which is the proportion that the C.R.E. policy limits bear to the total of the limits of all insurance policies covering the claim on the same basis. (Emphasis added).
The R.L.I. policy provides that it will constitute excess insurance over the amounts provided by basic policies. (Emphasis added). Once the limits of underlying policies are satisfied, R.L.I. will provide coverage of $1,000,000 for each accident. The words "excess" and "excess insurance" appear throughout the R.L.I. policy. The policy premium charged by R.L.I. was $160.00. C.R.E. charged a premium of $17,758. The disparity in premiums charged for the two policies reinforces the position that R.L.I.'s policy is in fact a true excess policy. See Benton, 550 So.2d at 861, fn. 2.
The C.R.E. policy provides primary coverage and the R.L.I. policy provides excess coverage. Therefore, these policies are non-concurrent. As noted by the First Circuit in Penton v. Hotho, 601 So.2d 762 (La.App. 1st Cir.1992), where one policy is primary and the other is a true excess policy, *424 the "excess" and "other insurance" clauses are not mutually repugnant and the true excess policy does not provide coverage until the primary policy limits are exhausted. Penton, supra at 766, citing Truehart v. Blandon, 884 F.2d 223 (5th Cir.1989). Furthermore, when two policies do not cover a claim on the same basis, pro-rata division does not apply. Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La.App. 4th Cir. 1992), writs denied, 604 So.2d 1315, 1318 (La.1992).
In Truehart, supra, the Fifth Circuit reversed the district court's holding that an "other insurance" clause, coupled with a "drop down" clause in an excess insurance policy, transformed the excess policy into a primary insurance policy. As noted by the Fifth Circuit:
[I]t is logical to assume that affordable and socially desirable catastrophic insurance would be difficult to obtain in Louisiana if we were loosely to allow transformation of umbrella policies because of boilerplate "other insurance" clauses in primary policies. Consequently, we are not convinced that Louisiana would allow a standard "other insurance" clause in the policy of an unrelated third party (the owner of the boat involved in the explosion) to define whether U.S. Fire should be treated as an excess or primary insurer.
The doctrine of mutual repugnancy appears to proscribe transformation of a primary policy into an excess policy if the "other insurance" clause would defeat the primary coverage originally contemplated by the parties and lead to absurd, unintended gaps in insurance protection. We find no benefit in applying the doctrine to achieve a dramatically different result: transforming a true umbrella policy into a primary policy where there is sufficient underlying insurance coverage.
But where, as in this case, the primary insurance is sufficient, there is no gap in insurance coverage even if each "other insurance" clause is given full effect.
Moreover, the doctrine of mutual repugnancy requires only that the "other insurance" clauses be given no operative effect. The doctrine has never been used in Louisiana as an instrument to transform a true excess insurance policy into a primary insurance policy where primary insurance is unexhausted.
Id. at 228.
The trial court erred in treating the R.L.I. policy as a primary policy. C.R.E. provides primary coverage for Maynor's claim up to its policy limits of $1,000,000. As the judgment in this case does not exceed C.R.E.'s policy limits, R.L.I.'s excess coverage is not implicated.

APPORTIONMENT OF COSTS
C.R.E. contends that the trial court erred in denying its claim against R.L.I. for reimbursement of certain costs. C.R.E.'s claim is for court costs, attorney fees and expert witness fees incurred by C.R.E. defending their mutual insureds. Throughout the litigation, R.L.I. continued to deny coverage. C.R.E. argues that R.L.I. should bear a proportion of these costs.
LSA-C.C. Art. 1920 affords the trial court broad discretion in assessing court costs and allows the trial court to render judgment for costs against any party as it may consider equitable. Earles v. Ahlstedt, 591 So.2d 741 (La.App. 1st Cir.1991). A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. State v. Nicholls College Foundation, 592 So.2d 419 (La.App. 1st Cir. 1991), writ denied, 593 So.2d 651 (La.1992); Ratcliff v. Town of Mandeville, 551 So.2d 761 (La.App. 1st Cir.1989), writ denied, 556 So.2d 37 (La.1990). We find no abuse of discretion in the trial court's assessment of costs in the instant case, especially in light of our determination that R.L.I. is a true excess insurer and as such is not liable to Maynor for his damages.

DECREE
The judgment is AMENDED in these respects:
(1) Plaintiff's, Larry Maynor's, award is increased to $635,165.58, with legal interest from date of judicial demand and is against defendants, Michael and William Vosburg, E.
*425 Lee Young & Company, Inc., and C.R.E., in accordance with their fault.
(2) All demands against defendant, R.L.I., are rejected at the costs of the other defendants.
AS AMENDED, the judgment is AFFIRMED.
LINDSAY, J., dissents with reasons.
SEXTON, J., dissents for the reasons assigned by LINDSAY, J.
LINDSAY, Judge, dissenting in part.
I dissent from the portions of the majority opinion (1) holding that the jury was clearly wrong in finding that there was no causal connection between the accident and the plaintiff's subsequent disc problems and (2) increasing the plaintiff's award of damages. (Since I would affirm the jury's damage award, which is less than $250,000, it is unnecessary to consider the issue of whether R.L.I.'s policy was a true excess policy.)
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings. Rosell, supra.
As the trier of fact, the jury did not accept the plaintiff's evidence that the Ruston accident caused permanent, debilitating injuries. To the contrary, the jury obviously accepted the testimony of Dr. Anthony Hucks-Folliss that the plaintiff sustained only a soft-tissue injury which he treated conservatively for a period of about six months. Dr. Hucks-Folliss was the first doctor to treat the plaintiff following the June 1989 accident. On June 20, 1989, he examined the plaintiff and gave him pain medication and a muscle relaxant. Dr. Hucks-Folliss diagnosed the plaintiff as suffering from an acute muscle and ligament injury. He saw the plaintiff again on July 11, 1989, at which time the plaintiff complained of worsening pain. Dr. Hucks-Folliss scheduled an MRI (magnetic resonance imaging) scan of the lumbar spine. This revealed mild degeneration of the disc at the L4/L5 level. However, since there was no evidence of a ruptured disc, the doctor chose to continue conservative treatment. The plaintiff returned to see him on August 28, 1989 and September 28, 1989. By the time he returned on October 26, 1989, he was showing some improvement. The plaintiff's final office visit was on December 26, 1989.
Additionally, the jury was undoubtedly persuaded by the testimony of Dr. Frank X. Cline, Jr., and Ms. Margo Gibson, a licensed occupational therapy assistant, that the plaintiff's performance on a B200 test (which is designed to measure the strength and the motion capacity of the low lumbar spine) was indicative of a person who was either trying to "fool" the machine and the examiner or was malingering.
Dr. Cline testified that he examined the plaintiff on June 4, 1992. Dr. Cline stated that the plaintiff did not supply a good history because he complained of so many different things and there was no discernable pattern to his complaints. Based upon his examination of the plaintiff and his past medical records and tests, Dr. Cline offered the opinion that he suffered from a long-term disc degeneration at the L4/L5 level as early as 1983.
Dr. Cline was also of the opinion that the June 1989 accident had no significant effect on the plaintiff's pre-existing disc problem or any other disc in his lumbar vertebrae. In addition to his medical diagnosis, he based his opinion on several other factors, noting that the plaintiff was firmly strapped in his seat with a seat belt and there was a "trivial" amount of force involved in the accident. Dr. Cline felt that the plaintiff's January 1991 surgery was due to the natural progressive deterioration of his disc.
Although the plaintiff denied prior lower back problems, his testimony was impeached by that of his former wife and his medical records. The plaintiff's former wife testified that in 1983 the plaintiff received a workrelated injury and that he consequently began seeing a chiropractor. Thereafter, the plaintiff would sometimes rub the small of his back. She was also aware that the plaintiff *426 was involved in another accident in 1988. She testified that after that incident he would sometimes complain and rub his lower back. A 1983 patient information sheet from the chiropractic clinic stated that the appointment concerned the plaintiff's low back; this document was signed by the plaintiff. The medical records of the plaintiff's general practitioner showed that the plaintiff was complaining of "chronic bad back" in 1985. Dr. Stephen Gardner, a neurosurgeon who saw the plaintiff in October 1990, did not diagnose a herniated disc. Dr. George Ferre, the doctor who performed several surgeries on the plaintiff and whose testimony most strongly supported the plaintiff's case, did not see the plaintiff and diagnose a herniated disc until November 1990, some 17 months after the accident.
It is meaningful to note that, in their closing arguments, both defense attorneys urged the jury that, if they felt they wanted to award the plaintiff something, they should give him $15,000 for a soft-tissue injury, wages for a six-month period of about $12,000, and his initial medical bills. This is almost exactly the sum awarded to the plaintiff by the jury, which had the great benefit of observing the plaintiff himself.
Based on the above, I cannot agree with the majority's decision to discard the jury's fact determinations and find that the jury was manifestly erroneous. The majority has impermissibly substituted its judgment for that of the jury even though there was substantial evidence supporting the jury verdict. Therefore, I dissent, in part.
APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS, LINDSAY and BROWN, JJ.
Rehearing denied.
NOTES
[1] In Buras v. United Gas Pipeline Co., 598 So.2d 397 (La.App. 4th Cir.1992), writ denied, 605 So.2d 1147 (La.1992), the Fourth Circuit noted that $100,000 was the minimum award for a herniated disc which requires a surgery. See also Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992) ($285,000), writ denied, 596 So.2d 210 (La.1992); Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App. 2d Cir.1989) ($375,000); Fanguy v. Dupre Brothers Construction Co., Inc., 588 So.2d 1251 (La.App. 1st Cir.1991) ($175,000), writ denied, 594 So.2d 892 (La.1992); Hutchinson v. Wal-Mart, Inc., 573 So.2d 1148 (La.App. 1st Cir.1990) ($250,000); McLemore v. Fox, 565 So.2d 1031 (La.App. 3d Cir.1990) ($300,000), writs denied, 569 So.2d 966, 968 (La.1990); Runnels v. Esteves, 550 So.2d 1225 (La.App. 4th Cir.1989) ($300,000), writ denied, 558 So.2d 1126 (La.1990); Tastet v. Joyce, 531 So.2d 520 (La.App. 5th Cir.1988) ($350,000).